GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY V. MICHAEL PIGOTT ET AL.

Decided March 10, 1909.

**1.—Injuries Resulting in Death—Private Corporations—Liability—Case Followed—Statute.**

Under the provisions of article 3017, Rev. Stats., all persons, natural and artificial, are liable in damages on account of injuries causing the death of any person when such injuries are the result of a wrongful act, negligence, unskillfulness or default in the performance of a duty. San Antonio G. & E. Co. v. Badders, 46 Texas Civ. App., 559.

**2.—Same—Railway—Indemnity—Recovery over—Pleading.**

Where a railway company was sued for damages for the death of an employe alleged to have been killed by its negligence, and interpleaded an electric company and sought to recover over against it in case plaintiffs recovered, a demurrer to the pleading could not rightfully be sustained on the ground that the statute giving actions for death has no application to persons or corporations other than such as were carriers of goods or passengers, and that the electric company, not being a carrier, could in no way be held liable in damages for injuries resulting in death.

**3.—Contribution—Indemnity—Tort Feasors.**

The general rule that there can be no contribution or indemnity as between wrongdoers is founded on the maxim that no one can make his own misconduct the ground for an action in his own favor. If he suffers because of his own wrongdoing the law will not relieve him; for it cannot recognize a right as springing from a wrong in favor of one concerned in its commission.

**4.—Same.**

There is an exception to the general rule under which, although the law holds all the parties liable as wrongdoers to the injured party, if, as between themselves, one of them is blameless, equity requires the one guilty of the wrong to indemnify the one who is guiltless for all damages that may be recovered against him by reason of his (the wrongdoer's) wrongful act. This exception is as well established as the rule itself.

**5.—Same.**

It is not necessary that the plaintiff's damage should have resulted immediately from the defendant's negligence; it is enough if the plaintiff, being legally liable though not personally at fault, for a third person's injuries due to defendant's negligence, has been compelled to answer therefor to the person injured. In such a case, the principal delinquent is bound to indemnify his co-delinquent, their fault being unequal; and this, whether any contractual relation exists between them or not.

**6.—Pleading—Indemnity—Recovery over—Injuries Resulting in Death—Liability—Primary Negligence.**

Answer, in an action against a railway company to recover for the death of its servant resulting from an electric shock caused by a defective wire heavily charged coming in contact with a metallic tank under which deceased was working, making the electric company furnishing the wire and power a party, held sufficient on demurrer to show that the latter's negligence was primarily the proximate cause of the death, and that if the railway company was guilty of negligence it was passive and secondary, and to state a cause of action.

**7.—Dismissal of Party—Appeal—Reversal.**

Where the original defendant impleaded a third party and sought a recovery over against it, stating a cause of action, error in sustaining general

demurrer of such third party and dismissing it from the suit, entitled the original defendant to a reversal of that judgment on appeal therefrom and from the judgment on the merits in favor of the plaintiff, regardless of the evidence as developed on the trial.

### 8.—Railway Companies—Negligence—Release from Liability—Contract.

It seems that a contract releasing a railway company from liability for injuries to an employe caused by the company's negligence, is void.

### 9.—Same—Case Overruled.

The case of International & G. N. Ry. Co. v. Hinzie, 82 Texas, 623, holding valid a contract by which the parents of a minor servant of a railway company released said company for injuries to the minor, is in conflict with the latter case of Texas & Pacific Ry. Co. v. Putman, 63 S. W. 910, which holds, in accordance with the great weight of authority, that such a contract is void, and the former is no longer authority on the question.

### 10.—Same—Contract—Consideration.

In jurisdictions where a contract relieving the railway company from liability for injuries to the servant caused by its negligence is recognized as valid, it is held that there must be a good consideration for such a contract, and if made while the servant is in its employment, without a new consideration, it is void. The consideration must be reasonable, that is, there must be a just proportion between the consideration for the waiver of the damages and the amount of damages actually sustained.

### 11.—Same.

A contract between the parents if a minor and the railway company by which they, in consideration of the employment of said minor, waived any and all claims they might have against the company for damages in the event the minor was killed or injured while in the employment of said company, was void for want of consideration, and constituted no defense to an action by such parents against the company for negligently killing the son.

### 12.—Charge—Submission of Issues—Negligence—Damages.

If there is evidence making actionable negligence and damages resulting therefrom issues, it becomes the duty of the trial court to submit them to the jury, although it may be of such slight probative force as to require of that court or the Appellate Court to set aside a verdict found upon such evidence.

### 13.—Negligence—Master and Servant—Dangerous Appliances—Electric Shock.

Where it was undisputed that the minor servant was killed by an electric shock while at work in the course of his employment and that the electric current entered his body by reason of his coming in contact with a metallic tank highly charged with electricity communicated by an extension cord used by the master about the place of work, and there was evidence tending to show that the cord was defective by reason of the master's failure to exercise ordinary care to have and maintain its insulation in such condition as not to admit of the escape of a sufficient amount of voltage of electricity to render its premises or anything thereon dangerous or unsafe to its servants employed there, the issue of actionable negligence was for the jury.

### 14.—Damages—Death of Minor Son—Verdict.

Evidence held sufficient to show that the parents suffered some damages by reason of the death of the minor son, but not to support a verdict awarding damages in the sum of ten thousand dollars.

### 15.—Same.

In an action by the parents for the death of the minor son, the measure of the relief was whatever pecuniary benefit they had a reasonable expectation of receiving from their son, had he lived.

Appeal from the District Court of Bexar County. Tried below before Hon. J. L. Camp.

*Baker, Botts, Parker & Garwood, D. C. Bolinger* and *W. F. Ezell,* for appellant.—The San Antonio Gas & Electric Company was under contract to furnish appellant with electricity, knowing the use that appellant would put it to and the character of its equipment, and it was therefore its duty to exercise a high degree of care in the transmission of this invisible and silent force to prevent a dangerous and excessive voltage from entering appellant's premises, and the failure to perform this duty was such a breach of its contract as would, under the pleadings, render it liable over to appellant for such damages as it may have been required to pay by reason thereof. City of San Antonio v. Smith, 94 Texas, 266; Eaton & Prince Co. v. Miss. Valley Trust Co., 100 S. W., 551; Alexander v. Nanticoke Light Co., 67 L. R. A., 475; Wheeler v. Northern Ohio Traction Co., 27 Ohio Cir. Ct. Rep., 517; Yates v. S. W. Brush Elec. & Power Co., 40 La. Ann., 467; Denver Consolidated Elec. Co. v. Lawrence, 73 Pac., 39; Gray v. Boston Gas & Light Co., 114 Mass., 149; Campbell v. Somerville, 114 Mass., 334; City of Brooklyn v. Brooklyn St. Ry. Co., 47 N. Y., 475; Churchill v. Holt, 127 Mass., 165; Leavenworth Coal Co. v. Ratchford, 48 Pac., 927.

The court erred in sustaining the first ground of plaintiffs' exception to the contract executed by appellees on or about November 4, 1904, which contract was pleaded by appellant as a defense to this suit. It was not prohibited by any statute, or against public policy, because it was not a contract with which the public was concerned, and said deceased was employed at the instance and with the consent of appellees for the purpose of learning a useful occupation, so that he would have employment in the future. International & G. N. Ry. v. Hinzie, 82 Texas, 627; Railway v. Carter, 95 Texas, 461.

The undisputed testimony showing that the said Michael Pigott had not been pecuniarily damaged by reason of the death of his said son, and that he had no reasonable expectation of receiving any contribution from said son had he continued to live, and not having sued for loss of services during minority, the court erred in refusing to give the special charge requested by appellant. City of Galveston v. Barbour, 62 Texas, 172; Railway Co. v. Lee, 70 Texas, 503; Railway Co. v. Henry, 75 Texas, 224; Railway Co. v. Johnson, 76 Texas, 421; S. Light & Power Co. v. Munsey, 76 S. W., 934.

*Ogden, Brooks & Napier,* for appellee, the San Antonio Gas & Electric Company.—Appellant's cross-bill stated no facts authorizing a recovery over against this appellee, but showed that if this appellee was liable at all, it was merely as a joint tort feasor with appellant, and that appellant would not be entitled to contribution from or a recovery over against it. Railway v. Nass, 94 Texas, 255.

*H. C. Carter* and *Perry J. Lewis,* for appellees, Michael Pigott et ux.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by Michael Pigott and his wife, Mary, against the appellant to recover damages for the death of their son, Thomas Pigott, alleged to have been killed by appellant's negligence. The negligence is alleged in plaintiff's petition substantially as follows: That on August 7, 1906, plaintiff's son, Thomas, was in the service of defendant in its boiler-making department in the city of San Antonio, Texas, and while working underneath a metallic tank in performance of the duties of his employment, through the negligence of defendant he received an electric shock which resulted almost instantly in his death; that defendant used and maintained electric lights where Thomas was at work, one of which lights was attached to a flexible extension cord about thirty feet long, so that it could be moved in the shop from place to place where it was needed; that at the time Thomas was shocked and killed this light was being used inside the metallic tank under which he was working, with the cord fastened to or resting upon some part of the tank; that by reason of the extension cord being unfit, defective and in unsafe condition for such use, a current of electricity passed therefrom into the tank and completely charged it with an electric current, so that when Thomas touched or came in contact with the tank he was shocked and killed; that the extension cord and wire used by defendant were defective, unsafe and dangerous in that the wire did not have an approved insulation and covering to thoroughly insulate and prevent the escape of the electric current, nor did the wire have an approved waterproof or weatherproof covering to withstand the effect of moisture; that the insulation of the wire was also worn and broken in places to such an extent that in coming in contact with a metallic surface, the electric current would pass from the wire into such surface; that the wire was too long and not a proper wire or cord to be exposed to moisture or water, or to be thrown over or laid upon metallic surfaces, and unfit and insufficient to prevent the escape of the electric current; and that it was negligence on the part of defendant to have and maintain said wire and extension cord in its defective, dangerous, unsafe and improper condition.

That at the time deceased was shocked and killed there was in force a valid city ordinance which prescribed the requisites of electric wiring of the kind used on said occasion by defendant; that paragraph 27, section 15, chapter 52, of the criminal ordinances of the city of San Antonio, is as follows: "27. Flexible Cord. a. Must have an approved insulation covering;" that it is further provided in section 27, that every violation of the terms of the ordinance, where a penalty is not otherwise prescribed, shall constitute a misdemeanor punishable by fine; that there was also in force when Thomas Pigott was killed a valid city ordinance regulating electric wiring and construction, section 13 of which is as follows:

"Section 13. All electrical construction, all material and all appliances used in connection with electrical work and the operation of all electrical apparatus in buildings in the city of San Antonio, and all outside electrical work, all systems and voltages, all inside work, all electrical signalling apparatus, and generally all works,

wires, machinery and appliances ·for generating, storing, measuring, supplying and using electricity in the city of San Antonio shall be in accordance and conformity with the rules and regulations of what is known as the National Electrical Code, being rules and regulations and requirements of the National Board of Fire Underwriters for the installation of electrical wiring and apparatus, as recommended by the Underwriters' National Electrical Association, edition of 1903. A copy of said code is hereto attached and made a part of this section as fully as if set out here; provided, however, that the city electrician shall give thirty days' notice by publication prior to any change or amendment going into effect."

That the rules and regulations of the National Electrical Code, referred to and made a part of said ordinance, provide as follows:

"28.   Flexible Cord.   a.   Must have an approved insulation and covering."

"45.   Flexible Cord.   a.   Must be made of stranded copper conductors, each strand to be not larger than No. 26 or smaller than No. 30 B. & S. gauge, and each stranded conductor must be covered by an approved insulation and protected from mechanical injury by a tough braided outer covering."

"For Portables.   f.   Flexible cord for portable use must meet all of the requirements for flexible cord "for pendant lamps," both as to construction and thickness of insulation, and in addition must have a tough braided cover over the whole. There must also be an extra layer of rubber between the outer cover and the flexible cord, and in most places the outer cover must be saturated with a moisture-proof compound, thoroughly slicked down, as required for 'weather-proof wire' in No. 44. In offices, dwellings or in similar places where the appearance is an essential feature, a silk cover may be substituted for the weather-proof braid."

That said extension or flexible cord used by defendant, as alleged, was in direct violation of the terms of said ordinances of the city, in that the cord did not have an approved insulation and covering, and in places the insulation was worn off and was too thin to prevent the escape of the electric current, and did not have an approved weather-proof covering and was not protected from mechanical injury by a tough braided outer covering, as required by said ordinance; that, in addition, the extension cord was spliced in places and the joints were not soldered or insulated so as to prevent the escape of the electric current; and that defendant was also negligent in having said joints in such uninsulated and defective condition and in violating a valid city ordinance in force at the time, which provides as follows:

"(c) Must be so spliced or joined as to be both mechanically and electrically secure without solder; they must then be soldered to insure preservation, and the joint covered with an insulation equal to that of the conductors.

"Stranded wires must be soldered before being fastened under clamps or binding screws, and when they have a conductivity greater than No. 10 B. & S. copper wire, they must be soldered into lugs."

That by reason of said defective, dangerous, unsafe and improper

condition of the electric wiring, the said wire was unfit and insufficient to restrain and confine the said electric current, and that the current on that account passed from the wire into the metallic tank, and it became charged with a deadly and dangerous current of electricity, and that when Thomas Pigott, working underneath the tank and having no knowledge of the fact that it was charged with electricity, came in contact with the tank he received a severe electric shock which almost instantly caused his death, which was caused from negligence of defendant as alleged.

In its first amended original answer the defendant interposed a general and special exception to plaintiffs' petition, a general denial, and pleaded specially that if deceased received injuries resulting in his death that they were not caused by negligence on its part, but by the negligence of the San. Antonio Gas & Electric Co., or were caused by his contributory negligence and risks assumed by him as incident to his employment. It also pleaded a written contract made between it and plaintiffs, whereby the latter consented to their son's employment by defendant and, in consideration of its paying him for his services, they expressly waived any and all claims they might have against defendant for damages in the event their son, Thomas, should be killed or injured in the company's employment.

The defendant also impleaded the San Antonio Gas & Electric Co., against which they pleaded as follows: "And for further answer in this behalf, if answer be required, this defendant says that the San Antonio Gas & Electric Company is a corporation duly incorporated under and by virtue of the laws of the State of Texas, and it has its principal office and domicile in the city of San Antonio, Bexar County, Texas, at which place it operates for public use and hire an electric plant, by and through which it furnishes and supplies to the citizens and industries of said city, who desire it and pay for it, electric lights and power, among other things; that the local agent and general manager of said company is W. B. Tuttle, who resides in said city.

"And this defendant further says that the said San Antonio Gas & Electric Company, which, for convenience, will hereinafter be referred to as the Electric Company, was also engaged in supplying electric power to the San Antonio Traction Company for the purpose of operating its street cars, and was engaged in supplying lights and power throughout the said city, including the arc lights, to light the streets and public places, and all of said varied services of light and power were performed and supplied by the transmission of very powerful currents of electricity in wires throughout the city; and in the neighborhood and vicinity of this defendant's premises, where the accident to Thomas Pigott occurred, were stationed some of the wires carrying said heavy currents of electricity, as well as numerous wires for ordinary lighting purposes, which latter wires carry, and were designed to carry, a light and comparatively harmless current of electricity; and this defendant says that said Electric Company had and maintained in the said vicinity and throughout the city, as aforesaid, numerous wires carrying said heavy and very dangerous currents of electricity to supply power and large lights, and to supply

remote wires and circuits, and it also had and maintained wires throughout the city in great numbers, which wires were designed to supply small lights, like the one in question in this case, and which were designed, as aforesaid, to carry the smaller and harmless currents; and the telephone companies of said city also had a great number of wires stretched throughout the city, and like said minor electric wires they were stretched in close proximity to the said large wires of said Electric Company, which carried the said heavy and deadly current of electricity; that the network of wires existed in and about the streets in the vicinity of the place of the accident in question, and throughout the city both electric and telephone wires were in close proximity at all times to the said larger wires which carried a very great current of electricity, and which current was so powerful as to be instantly fatal to man or beast who might come in contact with a wire or any object charged with it or with which it was even remotely in connection, and any wire connected with any one of said wires bearing said heavy current would instantly transmit the full force of same to all its connections, even to remote distances and in wholly unexpected quarters, and charge each and every wire, great or small, telephone or electric, with the current and thereby transform an innocent or comparatively harmless telephone or electric wire into a deadly menace to life which could not be seen or detected until too late to avoid it.

That this defendant was at the time in question one of the patrons of said Electric Company for hire, and was and had long been regularly using its electricity for lighting purposes at the place of the accident in question and at other places, and paid regularly therefor the agreed and fixed prices and charges agreed to and assented to by said Electric Company; that, among other lights, it became and was necessary for defendant to use and supply for the use of its employes engaged in work in its shop where Thomas Pigott was at work on the occasion in question, certain drop cords with 16-candlepower lights attached; that is, portable 16-candlepower lights, and it was necessary to have these portable lights to be used for lighting up the inside of tanks and boilers and such places for inspection purposes, and to work by in such places, which boiler rooms and shops had dirt floors and often became wet, all of which, as well as the kind and character of cords, attachments and appliances used in said shops and premises, and these conditions, were known to said Electric Company or could and would have been known to it by proper and prudent inspection and by the exercise of ordinary care, and any and all risks and dangers that would arise to this defendant's employes out of accidental or other contacts and connections with the wires and appliances through the ground or otherwise, as well as from faulty insulation and negligent maintenance of its machinery, lines and appliances, were well known to said Electric Company, or by the exercise of ordinary care could have been known, and because of this defendant's want of skill in the science of electricity it did not know of such matters, and was compelled therefore to rely and had the right to rely upon said Electric Company for protection against such dangers. Said sixteen candlepower lights require only a slight and

comparatively harmless current of electricity to serve them. It had always been the custom of said Electric Company and all other electric companies, and it was its duty, to supply such lights and their connections with such harmless or low grade current and no greater, and it was and had always been customary for them to exclude from such lamps and wires their heavier and dangerous currents; and it was the duty of said Electric Company to see to it that such heavier and dangerous currents did not invade the wires of such sixteen candlepower lights. And it was the duty of said Electric Company to use good and sufficient appliances to at all times prevent said dangerous currents from invading this defendant's premises, and this could have been done by the use of a transformer or other safety appliance and means installed at and near this defendant's said premises for the protection of the great number of lights thereon and the great number of persons working thereabout, and it was the duty of said Electric Company to have taken such precautions under the conditions existing, as aforesaid, as would have insulated said premises and said sixteen candlepower wires, and as would have guarded them against any possible invasion by any greater current of electricity than necessary and usual to serve them, and this could have been done by the use of well known modern appliances, methods and precautions and by the exercise of ordinary care; and this defendant being wholly ignorant of the science and business of generating and supplying and using electricity, did not know of such matter and how to provide therefor, but was compelled to and had the right to and did rely upon said Electric Company, as was the common practice of all its customers, to do whatever was needful and proper to protect its employes and persons on its premises from harm and danger arising out of the use and presence of this mysterious and deadly fluid; and said Electric Company wholly failed and neglected to exercise due and proper care in these respects, and thereby directly brought about the death of Thomas Pigott, if in fact he died from an electric shock.

"That in view of the thousands of wires stretched and maintained in said city by said Electric Company and others in proximity to it, said wires carrying said great and dangerous current, it became and it was the duty of said Electric Company to use a high degree of care and precaution to confine said great and deadly current to the large wires, all main wires only, and to see to it that by accidental contact or transfer by close proximity or other means it did not leak or escape to and over other wires and invade the premises of this defendant on the wires used by it for lighting purposes; and it was the duty of said Electric Company in supplying to this defendant the light at the point where the accident in question occurred and similar lights thereabout, to allow no greater current of electricity to charge said wires on its premises than usual and necessary to supply said lights, which were of small size, and which current would and should have been comparatively harmless to one coming in contact with it; and this was a duty said Electric Company owed to this defendant and to said Tom Pigott, as one of defendant's employes, for whose benefit the light was supplied; and

this defendant says that said Electric Company by use of insulation on its wires and connections, by machines and appliances to control and confine the said great and deadly current to special wires, by the employment of a sufficient number of skillful men in the business to look after all its connections and insulations and its machines and appliances for confining said great current to special wires, by the employment of competent and prudent men to overlook and inspect its lines to prevent accidental contact by wires with said wires carrying said great current, and by preventing ground connections from all its wires and machines, and by ordinary care, such as a person of ordinary care would have used under the circumstances, could have confined said great and dangerous current to special wires, and could have prevented it from escaping and invading the minor wires, such as the light wire in this defendant's premises where the accident in question happened, and could have prevented the creation of a circuit through persons coming in contact with its wires and their connections; but, unmindful of its duties and obligations to this defendant and to the said Tom Pigott such as the law and the contract imposed, it wholly failed and neglected to exercise any of said precautions, but negligently permitted its wires, machines and appliances above referred to and the insulations of its wires and appliances, to become defective and out of repair, and to become grounded and dangerous, and to be and become improperly used, fixed and applied, and neglected to exercise due care to have these things and its wires and appliances watched and inspected and kept in safe condition, and to avoid contact and connection with the said powerful current, and by reason of its negligence said great and dangerous current of electricity was permitted to escape from somewhere and to invade this defendant's premises over a small wire which should not have been permitted to carry a dangerous current; or else by grounding and improper insulation the minor current became dangerous by the formation of a circuit by contact. And it was said Electric Company's duty to see to it that such dangerous conditions did not arise, and that an excessive and dangerous current was not permitted to charge the wire connecting said light, and that no wires, great or small, should become grounded, all of which duties and obligations it violated, as aforesaid, and if said Tom Pigott's death resulted from an electric shock, as charged in the petition, which is not admitted but denied, then the same was due to the negligence of the said Electric Company and to their default and violation of duty to this defendant and to said Tom Pigott.

"And should this defendant be adjudged guilty of any wrong and required to pay any sum in this suit, then by reason of the facts stated said Electric Company is liable to this defendant for any and all such sums and costs, and this defendant is entitled to judgment over against it for any and all such sums.

"This defendant further says that, as before stated, it is not familiar with the scientific details of electricity, its uses and management and the attachments, appliances and methods necessary and proper for its prudent use and management, and it can not now name the various machines, appliances, methods, and precautions used and

necessary to the proper and safe use of it, and it can not therefore show with exact particularity the wires, machines, appliances and methods that were neglected and deficient, and the places where this existed, and can not with certainty say where they existed, or exactly which was defective or at fault, except that as one item it is informed and believes that a certain machine, supposed to be called a transformer, located on or near Austin Street, in the vicinity of the place of the accident, was defective and the wires and connections were not in good repair, but were defective and insufficient, and this is probably the cause, or one of the causes, of the death of Tom Pigott, if in fact it was caused by electricity. This defendant says, however, that suddenly and without warning a great and deadly current did invade its said premises at the time and place of the accident, and was the cause thereof, if in fact the said Tom Pigott was killed by electricity, and it is not now in defendant's power to state the exact reason and cause of the same with greater particularity than has already been done, because, as aforesaid, the use and handling of electricity is a mysterious and scientific subject with which the public and this defendant are not familiar, and the working and management of its said business was wholly unknown to the outside world, and is of such a nature that it is and was peculiarly and entirely within the knowledge and control of said Electric Company and its agents only, but said invasion of said current, as aforesaid, could not have happened but from some fault and neglect or want of ordinary care and violation of its duty to this defendant and to said Tom Pigott upon the part of said Electric Company, and it was due to its negligence and default, as aforesaid.

"This defendant now prays for service of this answer on plaintiffs and upon said San Antonio Gas & Electric Company, as required by law, and that upon final hearing of this cause plaintiffs take nothing as against this defendant, and that it recover its costs. If, however, it should be found and held that this defendant is liable for any amount whatever, then and in that event it prays for judgment over and against said San Antonio Gas & Electric Company for any and all sums so recovered against it, and all costs. And this defendant further prays that it be accorded any and all relief, either at law or in equity, to which it may show itself entitled upon the trial, and it will ever pray," etc.

The plaintiffs in a supplemental petition in reply to defendant's amended answer, alleged that if it was true, as averred by defendant, that an excessive, unusual and dangerous current of electricity entered defendant's premises where deceased was at work and that such excessive and unusual current caused his death, it was negligence in the defendant to permit such excessive, unusual and dangerous current to enter the building through the wires therein, and particularly the wire which was being used when he was shocked and killed. That it was defendant's duty to furnish deceased a reasonably safe place to do his work, and to exercise ordinary care to protect him from danger of any excessive, unusual or dangerous current of electricity; that at the time of his death, and long prior thereto, there was in common use a simple, inexpensive and effective contrivance

or device known as a fuse-block, the purpose of which was to prevent an excessive, foreign or unusual current of electricity from entering certain premises on the light wires therein; that such fuse-block was ordinarily placed at or near the point where the wire entered the building, and another fuse was placed at the point where the particular wire emerged from the building; the purpose of such fuse-blocks was to prevent the entry of any excessive or unusual current of electricity or any current greater than that designed to be carried by the inside wires serving the building, and, when properly placed and arranged, they effectually accomplished such purpose; that if an excessive and unusual current of electricity entered defendant's premises and the particular wire where Tom Pigott was at work, then defendant was guilty of negligence in failing to have fuse-blocks so as to prevent the excessive or unusual current, or if it had fuses or fuse-blocks they were defective, improper and unfit; for, with proper fuses or fuse-blocks properly placed, it would have been impossible for any excessive or unusual current or any current greater than was designed to have been carried by the inside wires, to have entered defendant's premises through said wires, and that if an unusual and excessive current did enter said premises and wires it was due entirely to the negligence of defendant in not having proper and sufficient fuses or fuse-blocks, and such negligence was also a proximate cause of the death of Thomas Pigott, for which defendant is liable. To this supplemental petition defendant demurred, and the demurrer was overruled.

The San Antonio Gas & Electric Company appeared and interposed general demurrer to all that portion of defendant's first amended original answer by which judgment over against it was sought, which demurrer was sustained and judgment entered dismissing said company from the suit. The case was then, as between plaintiffs and the railway company, tried before a jury and judgment rendered against appellant for $10,000, which, in accordance with the verdict, was equally apportioned between the plaintiffs. From the judgment in favor of the San Antonio Gas & Electric Company on its demurrer, as well as from the judgment in favor of plaintiffs, the defendant has appealed.

We will first consider the assignments which complain of the court's sustaining the exceptions of the San Antonio & Electric Company (hereinafter called the Electric Company) to that portion of defendant's first amended original answer making the company a party and asking judgment over against it in the event of plaintiff's recovery against the original defendant. While one of these is denominated a special exception, both are general; for the one called "special" does not specifically indicate or point out any particular defect or defects in that part of the answer which is directed against the Electric Company. Therefore, the first and second assignments of error which complain of the action of the court on these exceptions will be considered as one and as involving the question, whether the part of the answer excepted to states a cause of action against the Electric Company. In passing upon the question, the allegations in the answer must be taken as true, and every reasonable intend-

ment arising upon the pleading must be indulged in favor of its
sufficiency.

We regret that we are not favored with a brief of the attorneys for
the Electric Company, disclosing the reason they pressed upon the
trial court for sustaining the exception. The reason, however, must
have been one or both of these: (1) That article 3017, Revised
Statutes of 1895, giving actions resulting in death, has no applica-
tion to parties other than the proprietor, owner, charterer, or hirer of
a railroad, steamboat, stage-coach or other vehicles for the conveyance
of goods or passengers, and that, as the allegations in the answer
negative the idea that the Electric Company is any such person or
corporation, it can in no way be held liable in damages for injuries
resulting in death; or (2) that there can be no contribution between
joint tort feasors, or recovery over by one against the other of dam-
ages for which either is liable. Is either of these a sufficient ground
for sustaining the Electric Company's general exception to the part
of the railroad's answer which seeks to recover over against this ap-
pellee in the event of a recovery against the appellant? If not, then
we can perceive no reason why the exception to that part of defend-
ant's answer should be sustained.

We believe there is nothing in the first objection suggested to that
part of the answer to which the exception was sustained. The grounds
for this belief are fully exposed in the opinion of this court in the
case of San Antonio Gas & Electric Co. v. Badders, 46 Texas Civ.
App., 559, which closes the question and renders further discussion
of it unnecessary.

The second ground suggested as one upon which the court might
have sustained the exception to the answer is not so easily disposed
of. The general rule that there can be no contribution or indemnity
as between wrongdoers is founded on the maxim that no one can
make his own misconduct the ground for an action in his own favor.
If he suffers because of his own wrong-doing the law will not relieve
him; for it can not recognize a right as springing from a wrong in
favor of one concerned in its commission. (Galveston, H. & S. A.
Ry. Co. v. Nass, 94 Texas, 255; Gulf, C. & S. F. Ry. Co. v. Galves-
ton, H. & S. A. Ry. Co., 83 Texas, 509; Northern Traction Co. v.
Caldwell, 44 Texas Civ. App., 374; Ft. Worth & D. C. Ry. v.
Chicago, R. I. & G. Ry. Co., 105 S. W., 829; St. Louis & S. W. Ry.
Co. v. Black, 109 S. W., 410; Johnson v. Torpy, 35 Neb., 604, 37
Am. St. Rep., 477; Boyer v. Bolender, 18 Atl., 127; Oakdale v. Gam-
ble, 50 Atl., 971.)

But there is an exception to this rule, under which, although the
law holds all the parties liable as wrongdoers to the injured party,
if, as between themselves, one of them is blameless, equity requires
the one guilty of the wrong to indemnify the one who is guiltless
for all damages that may be recovered against him by reason of his
(the wrongdoer's) wrongful acts. This exception is as well estab-
lished as the rule itself. (Gulf, C. & S. F. Ry. v. Galveston, H. &
S. A. Ry., *supra;* City of San Antonio v. Smith, 94 Texas, 266; City
of San Antonio v. Talerico, 98 Texas, 151; Pullman Co. v. Norton,
91 S. W., 843; Southwestern Tel. & Tel. Co. v. Krause, 92 S. W.,

431; City of San Antonio v. Pizzini, 95 Texas, 1; Kampmann v. Rothwell, 101 Texas, 535; Eaton v. Mississippi V. Trust Co., 100 S. W., 551.)

Upon this subject it is said in Shearman and Redf. on Negligence (5th ed., sec. 24a): "It is not necessary that the plaintiff's damage should have resulted immediately from the defendant's negligence; it is enough if the plaintiff, being legally liable, though not personally at fault, for a third person's injuries, due to the defendant's negligence, has been compelled to answer therefor to the person injured. In such a case the principal delinquent is bound to indemnify his codelinquent, their fault being unequal; and this whether any contractual relation exists between them or not." See also Webb's Pollock on Torts (Enlarged Am. ed.), 231 and note; Cooley on Torts (3d ed.), 254 *et seq.;* Alexander v. Nanticoke Light Co., 67 L. R. A., 475; Gray v. Boston Gas Light Co., 114 Mass., 149.

If the part of appellant's answer to which the exception was sustained, when every reasonable intendment arising upon it is indulged in its favor, brings the case within the exception to the general rule, the defendant's right to recover over against the Electric Company such damages as plaintiffs should recover against it, conceding the allegations in the answer are true, was made out. The question as to the sufficiency of the pleading must be determined from its allegations without regard to the evidence adduced upon the trial; for whatever the evidence might show upon the question of negligence as between plaintiffs and appellant can not affect the question of the latter's right to recover over against the Electric Company. Though the evidence before us may be such as would, if the latter company had been before the court, bring the case as between the railway and the electric company within the general rule denying indemnity, still, as the latter was not before the court when the evidence was adduced, such evidence bound neither party and can not be looked to here for the purpose of ascertaining whether the railroad has a right of action over against the electric company.

The sole question is, did appellant's answer state such a cause of action? If it did, then the railroad company could not be denied the right to introduce its evidence in support of its allegations for the purpose of having the jury determine whether it made out such a case against the Electric Company as entitled appellant to a judgment over against it. Upon carefully considering the answer in the light of the principles stated we conclude that, if the allegations are true, it states a case against the Electric Company that falls within the exception stated, showing that such company was the party whose active negligence was primarily the proximate cause of Thomas Pigott's death; and that if the appellant was guilty of any negligence it was only passive and secondary. In such event, it is entitled to recover over against the Electric Company as the active wrongdoer, whose wrongs alone rendered the appellant liable on account of the relation of master and servant and its correlative duties which existed between it and the deceased at the time he was killed.

The third and fourth assignments of error, which relate to the judgment in favor of plaintiffs against appellant, complain that the

court erred in sustaining the exceptions to that part of appellant's answer which pleads, in avoidance of plaintiffs' action, the contract of employment of deceased during his minority that they made with defendant, in which they expressly waived any and all claims they might have against the company for damages in the event their son should be killed or injured while in its employment. The exceptions were (1), that the part of the contract waiving any claim for damages that might accrue is void, in that it is against public policy and seeks to exempt the company from its liability for injuries resulting in death caused by its own negligence; and (2) that it is without consideration, either good or valid in law.

As it is conclusively shown that plaintiffs' son was killed during his minority, and while the contract of employment referred to in the assignments was in force and deceased was in discharge of his duties under the contract, if the stipulation therein by plaintiffs, waiving any claim they might have against the company for damages in event Thomas was killed or injured while in the employment, is valid, it logically follows that the court was in error in sustaining the exceptions. The question is, is such stipulation valid?

"It is generally held," says Page on Contracts, sec. 367, "that an employer can not release himself for liability for injury to his employe caused by his own negligence. . . . Invalid contracts of this class are most commonly entered into between railroads and their employes." Citing Roesner v. Hermann, 10 Biss. (U. S.), 486; Chicago, etc., Coal Co. v. Peterson, 39 Ill. App., 114; Blanton v. Dold, 109 Mo., 64, 18 S. W., 1149; Bonner v. Bean, 80 Texas, 152; Otis v. Pennsylvania Co., 71 Fed., 136; Louisville, etc., R. R. Co. v. Orr, 91 Ala., 548, 8 So., 360; Hissong v. Richmond & D. R. R., 91 Ala., 514, 8 So., 776; Kansas, etc., Ry. v. Peavey, 29 Kan., 169, 44 Am. Rep., 630; Purdy v. Rome, W. & O. R. R., 125 N. Y., 209, 21 Am. St. Rep., 736, 26 N. E., 255; Lake Shore & M. S. Ry. v. Spangler, 44 Ohio St., 471, 58 Am. Rep., 833, 8 N. E., 467; Memphis, etc., Ry. v. Jones, 2 Head. (Tenn.), 517. Continuing, the same author says: "So a contract whereby the next of kin of an employe of a railroad releases the railroad from all liability to himself for an injury to such employe was held void." Citing Tarbell v. Rutland R. R., 73 Vt., 347, 87 Am. St. Rep., 734, 56 L. R. A., 656, 51 Atl., 6. "Even where power is given to a railroad to 'farm out' its right of transportation, it can not insert a valid provision in a lease exonerating itself from liability to lessee's employees from lessee's negligence." Citing Hardin v. North Carolina R. R., 129 N. C., 354, 55 L. R. A., 784, 40 S. E., 184.

Cooley on Torts (3d ed., p. 1485), after mentioning carriers and telegraph companies as among those who can not relieve themselves from liability for their own negligence, says: "The cases of carriers and telegraph companies have been specifically mentioned because it is chiefly in these cases that such contracts are met with. But, although the reasons which forbid such contracts have special force in the business of carrying persons and goods and of sending messages, they apply universally, and should be held to defeat all

contracts by which a party undertakes to put another at the mercy of his own faulty conduct." The author, then, in a marginal note, says: "A contract exempting the master from liability to his servant for negligence is void."

It is stated, however, in Shearman & Redf. on Neg., sec. 241d, that in some American courts it is held that a servant can by express contract release his master from all liability for the ordinary negligence of the master. This holding is also noticed in the section of Page on Contracts, above quoted from, and, among the cases holding it, is cited International & G. N. Ry. v. Hinzie, 82 Texas, 623, relied upon by appellant to sustain the assignments under consideration. That case, though not referred to in the opinion, seems to have been overruled by the Court of Civil Appeals of the Second District, in Texas & P. Ry. Co. v. Putman, 63 S. W., 910, which holds, in accordance with the weight of authority, as stated in this opinion. And, as the Supreme Court approved the opinion in the Putnam case by denying a writ of error, we think we are safe in saying that the Hinzie case is no longer authority on the question under consideration. It would seem an enormity to sanction a contract which exempts one from liability for the death of a human being which he has brought about by his own negligence. "Negligent homicide" is an offense under the laws of this State, and it is universally held that it is contrary to public policy to uphold a contract which exempts the wrongdoer from liability for the consequence of an act done in violation of a criminal statute.

Besides, in jurisdictions where such contracts are recognized as valid, it is held that there must be a good consideration for such a contract, and if made while the servant is in his employment, without a new consideration, it is void. As seen, one of the exceptions urged to the plea setting up the contract as a defense, was that it was without consideration to support it. We believe this objection good. Under the contract the consideration recited is no consideration at all. The parents waived everything—their right to recover their son's wages, as well as their right to recover damages vouchsafed them by the law in the event he was killed or injured while in the employment of the company—and got nothing in the world except the piece of paper upon which the alleged contract was written. Their damages caused by the death of their son, caused by defendant's unlawful act, was, if the verdict be correct, $10,000; and yet if the contract under which they received nothing is sustained, they have waived their right to these damages and can not receive one dollar of the amount. Is this reasonable? No. Yet it is not only essential to the validity of a contract of this nature, even in jurisdictions where they are recognized, that there be a consideration, but that it must be reasonable, that is, there must be a just proportion between the consideration for the waiver of the damages and the amount of damages actually sustained. We overrule the assignments.

The fifth assignment complains that the court erred in failing to instruct the jury at defendant's request, that there was no evidence that plaintiff, M. Pigott, sustained any pecuniary damages by reason

of the death of his son, and to return a verdict in favor of defendant as to him; the sixth, of the court's overruling defendant's motion for a new trial upon the ground that the verdict is grossly excessive and manifests bias in favor of plaintiffs or prejudice against the defendant, or other improper motives on the part of the jury; the seventh, of the court's refusal to grant a new trial on the ground that the verdict in favor of M. Pigott is grossly excessive, etc.; the eighth, of the failure of the court to grant a new trial upon the ground that the damages assessed in favor of Mary Pigott are grossly excessive, etc.; the ninth, of its refusal to grant a new trial upon the ground that the verdict in favor of Michael Pigott is without evidence to support it; the tenth, that the verdict is contrary to and against the overwhelming weight of the evidence; the eleventh, that the court erred in overruling defendant's motion for a new trial, because the evidence wholly fails to show that the death of deceased was proximately caused by the condition of the insulation on the extension cord; the twelfth, that the court erred in refusing to peremptorily instruct the jury to return a verdict for defendant; and the thirteenth, of the court's failure to grant a new trial upon the ground that the verdict is contrary to the law and without evidence to support it. As all these assignments require a consideration of the evidence and an enunciation of the principles of law applicable to the facts deduced from it, they will be considered together.

The first questions arising from the assignments which we shall consider are, Was there any evidence reasonably tending to show that Thomas Pigott's death was proximately caused by the alleged negligence of defendant? and if there was, then, does the evidence reasonably tend to prove that the plaintiffs suffered damage by reason of his death? The determination of these questions will, in effect, dispose of the assignments. For the disposition of those, from which the questions are evolved, will furnish the means of readily solving all others. If there was evidence to make both these questions issues, it was the duty of the trial court to submit them to the jury, although it might have been of such slight probative force that it would become the duty of that court or of the Court of Civil Appeals to set aside a verdict found upon such evidence. (Wallace v. Southern Cotton Oil Co., 91 Texas, 21; Paddock v. Bray, 40 Texas Civ. App., 226; Reynolds v. Galveston, H. & S. A. Ry. Co., 99 S. W., 569; Boyd v. St. Louis S. W. Ry. Co., 101 Texas, 411; Trimble v. Burroughs, 52 Texas Civ. App., 266.)

It is undisputed that deceased was the son of plaintiffs; that he was the servant of defendant; that he was killed by an electric shock while at work for defendant in the course of his employment; that the current of electricity which killed him entered his body by reason of his coming in contact with a metallic tank which was highly charged with electricity communicated to it by an extension cord, to which was attached an electric light then being used by the defendant about the place where deceased was at work. If, then, the cord was defective, by reason of the defendant's failure to exercise ordinary care to have and maintain its insulation in such condition as not to

admit of the escape of a sufficient amount or voltage of electricity to render its premises or anything thereon dangerous or unsafe to its servants employed there, it was negligent; and if, by reason of such negligence, the electricity which shocked and killed deceased was communicated to the tank because of such negligence, it became liable to plaintiffs for any pecuniary damage they sustained on account of his death, unless he was guilty of negligence which proximately contributed to his injuries. There was evidence reasonably tending to show that the cord was defective, as alleged, and that defendant was negligent in maintaining and using it on its premises when and where deceased was killed by the electricity communicated to the tank by reason of its defective insulation. We believe this evidence was not only sufficient to carry the case to the jury on the question as to whether the death of Pigott was proximately caused by defendant's alleged negligence, but amply sufficient to warrant the jury in returning an affirmative answer to the question, as was done by the verdict.

This brings us to the other question: Does the evidence reasonably tend to prove that plaintiffs suffered damage by reason of their son's death? They were the only persons in existence to whom the right of action for injuries resulting in death is given by the statute; and it was assumed by the Legislature that parents might suffer damages on account of the death of their child, else such a right of action would not have been given for their benefit. The evidence shows that deceased at the time of his death was twenty years and ten days old; that at the time he was in the employ of the railroad company as an apprentice in its boiler shop at San Antonio, earning wages at from $22 to $29 per month, which, when paid, he handed to his mother and it was used in the support of the family; that he was a musician also and made some money at his music which he retained for his own use; that his mother was fifty-seven and his father sixty-five years old when he was killed; that his father's health was not good, and was occasionally so bad that he could hardly walk, and he (the father) was not able to do very much work; that deceased was a strong, healthy and able-bodied and good boy. His mother testified that he spent most of his time at home, and that he was ambitious and wanted to do something in order to help; that he was very affectionate and dutiful to his parents and was ever trying to aid in support of the family.

This evidence is, in our opinion, sufficient to warrant the jury in giving the question an affirmative answer, that is, that plaintiffs suffered some damage by reason of their son's death. The question is, how much damage did they suffer on that account? This was a question for the jury, and a very difficult one for conscientious men to decide. For it depends upon factors which lie in the future, which is so dimly lighted by the present that they only present the shadow of facts, which, at best, can only present a degree of probability, rendering it extremely difficult to estimate the pecuniary loss which has been sustained by these old people. It can not be more than the pecuniary benefits they would have received from their son had he not been killed; but what that would have been is the question.

Whatever pecuniary benefit they had a reasonable expectation of receiving from their son had he lived the jury was authorized by the law to award them as damages for his death which deprived them of the value of such anticipated pecuniary aid.

For the plaintiffs to have received from him anything approaching the sum of money awarded by the verdict, the jury must have found that it could reasonably be anticipated (1) that but for the accident deceased's life would have continued a sufficient period to enable him to confer on his mother and father benefits equal in value to the sum of $10,000; (2) that deceased would have conferred upon them benefits of that value; (3) that to be the recipients of such benefits plaintiffs' lives would have extended through the period of time it would have required their son to give them such pecuniary aid. These findings only could have been made through that process of induction which logicians call "Approximate Generalization." The facts involved in the findings of the jury belong to that class of inductive truths avowedly not universal, in which it is not pretended that the predicate is always true of the subject; but the value of which, as generalizations, is nevertheless extremely great. As is said 'by logicians, "An important portion of the field of inductive knowledge does not consist of universal truths, but of approximations of such truths; and when a conclusion is said to rest on probable evidence, the premises it is drawn from are usually generalizations of this sort." The facts sought to be proved belong to the class of cases which present themselves in life which are too complicated, and a decision must be made too rapidly, to admit of waiting till the existence of a phenomenon can be proved by what have been scientifically ascertained to be universal characterizations of the class.

It is known, though not as a universal fact, that the lives of young men generally exceed those of their parents. From this knowledge common to mankind, the jury was authorized to conclude that the deceased, who was a stout, healthy, vigorous boy of twenty years, would have lived longer than either of his parents, one of whom was fifty-seven and the other sixty-five years old, had he not been killed. From the same process of reasoning the conclusion could be reached that his earning capacity would materially increase from the knowledge and skill he would acquire as he advanced into mature manhood; and that, from his kind and affectionate disposition to his parents and the amount of money he was contributing to their support and maintenance when his life was cut off by defendant's negligence, he would continue to contribute to them such sums as might be necessary for their comfort and maintenance as long as they should live.

A great sociologist has said: "When the minds of children are no longer stunted and deformed by the mechanical lessons of stupid teachers; when instruction, instead of giving mutual pain, gives mutual pleasure by ministering in proper order to faculties which are eager to appropriate fit conceptions presented in fit forms; when among adults widespread knowledge is joined with rational ideas of teaching, at the same time that in the young there is an easy unfolding of the mind such as is even now shown by exceptional facility of

acquisition; when the earlier stages of education passed through in the domestic circle have come to yield, as they will in ways scarcely dreamed of at present, daily occasions for the strengthening of sympathy, intellectual and moral, then will the latter days of life be smoothed by a greater filial care, reciprocating the greater parental care bestowed in earlier life." Who can say, when the character and devotion of this young man is considered, that this prophecy would not have been fulfilled, as to his old father and mother, through him, had he lived?

And upon the principle of approximate generalization we believe the jury were warranted in finding that plaintiffs would have lived long enough to have been the recipients of substantial pecuniary benefits from their son had he not been killed; though the mortuary tables may have limited their life expectancy to such duration of life as would render it impossible for their son to have contributed anything approximating the sum found by the jury. One's life expectancy is estimated from the general average of the lives of a great number of persons; but the principle of "general average" should be applied to cases which are neither known, nor can be presumed, to be other than average cases. Therefore, such averages are commonly of little use for the particular guidance of any affairs but those which concern large numbers. Hence, tables of the chances of life are useful to insurance companies, but they go a very little way toward informing anyone of the chances of his own life, or any other life in which he is interested, since almost every life is either better or worse than the average.

But where an ultimate fact must be arrived at from the proof of a number of other facts as its premises, the probability of proving the ultimate fact is lessened in proportion to the number of facts that are to be proved. If, for illustration, it could not have been found by the jury in this case, that deceased would have continued to live long enough to earn and to contribute to plaintiffs of his earnings $10,000, the ultimate conclusion that they were damaged by his death in that sum would fail; or if it could not have been found, though it were found he would have lived long enough to make such contribution, that he would contribute to them after attaining his majority, the conclusion embodied in the verdict as to the amount of the damages would likewise fall to the ground; and so on, as to each fact necessary to be found to support a verdict for that sum.

In view of these uncertainties, we are of the opinion that the verdict is excessive, the majority of the court being of the opinion that the evidence does not tend to support a verdict for more than $7,500. The writer was strongly inclined to the opinion that the evidence did not warrant that sum; but he has acquiesced, though not without reluctance, in the superior judgment of his associates.

The judgment of the District Court against the appellant in favor of the San Antonio Gas & Electric Company is reversed, and, as between them, the cause is remanded to the District Court for a new trial. The judgment in favor of the plaintiffs against the appellant will also be reversed on account of the excessive verdict, unless they

shall within ten days from this date file a remittitur of $2,500, in which event the judgment to the amount of $7,500 will be affirmed. Reversed and remanded in part, and remittitur suggested as to judgment in favor of plaintiffs.

*Reversed and remanded in part and*
*affirmed on remittitur in part.*

### ON MOTION FOR REHEARING.

On motion of appellee, the San Antonio Gas & Electric Company, for rehearing.

It will be observed from our original opinion that, as to this appellee, the case was decided without the assistance of a brief in its behalf, none being on file in this court. It has since been made known to us that appellee's counsel had prepared and printed, a copy thereof having been furnished appellant's counsel in ample time before the case was submitted, a brief in reply to the various assignments of error presented by appellant against the judgment in appellee's favor; but which, for some unaccountable reason, had not been filed in this court. Upon motion of the appellee, based upon these facts, we have granted leave to file copies of its brief, to be considered in disposing of this motion.

It is insisted by the motion that we erred in considering appellant's assignments of error which complain of the trial court's sustaining this appellee's exceptions to that part of defendant railway's answer which sets up its cross-action. The predicate for this insistence is that the exceptions were sustained to defendant's second amended original answer and the appellee dismissed from the suit on March 3, 1908, and that the case was tried on the defendant railway's third amended original answer filed April 27, 1908, at a subsequent term of the court to that at which this defendant was dismissed from the case. The record discloses such a state of facts. We do not think, however, that it serves as a predicate, or, logically, as a premise, for the conclusion that the assignments of error as to the court's sustaining the exceptions should not be considered. The effect of sustaining the exceptions was, as declared by the order of the court, to dismiss this appellee from the case. It was a matter of no moment or concern to the Gas & Electric Company what amendment was afterwards made in the pleadings of the other two parties, or upon what pleadings the case was tried between them. The question between it and the defendant railway company was, whether the latter's second amended original answer stated a cause of action entitling it to a recovery over against the Gas & Electric Company in the event of a recovery by the plaintiffs against the railway company. If it did, the exceptions should not have been sustained, and as an appeal from the ruling of the court could not be prosecuted until final judgment was rendered against the railway company, the appellant's right to have such ruling revised was not affected by the state of the record upon which this appellee bases its contention that the assignments complaining of such ruling should not have been considered.

The second amended original answer, to which the exceptions were

sustained, contained the statement of the railway's cause of action against this appellee. And, as is said in the original opinion, its sufficiency is to be tested by the allegations it contains, without regard to the evidence adduced upon the trial of the case as between plaintiffs and the original defendant. Taking the allegations as true, and indulging every reasonable intendment favorable to the pleading, we believe that as between the railway company and this appellee it states a good cause of action in favor of the former against the latter. The reasons for this holding, and the authorities upon which it is based, are fully set out in the original opinion. The motion is overruled.

*Overruled.*

Writ of error refused.