### WAINWRIGHT v. PENNSYLVANIA R. CO.

(District Court, E. D. Missouri, E. D. October 22, 1918.)

No. 4893.

1. WAR ⊂⊃4—WAR POWERS OF CONGRESS—DELEGATION OF POWER TO EXECUTIVE—RAILROAD ADMINISTRATION ACT.

Act March 21, 1918, providing for federal control of railroads during the war and authorizing the President to make regulations therefor, assuming that it authorizes the fixing by such regulations of the venue of actions in federal courts against railroad companies, is within the war powers of Congress, and constitutional.

2. WAR ⊂⊃4—FEDERAL CONTROL OF RAILROADS—EXECUTIVE REGULATIONS.

Amended regulation No. 18a, promulgated by the Director General of Railroads April 18, 1918, providing that "all suits against carriers while under federal control must be brought in the county or district where the plaintiff resided at the time of the accrual of the cause of action or in the county or district where the cause of action arose," as applied to suits in the federal courts, is within the authority conferred on the President by Act March 21, 1918.

3. STATUTES ⊂⊃205—CONSTRUCTION—RULE GOVERNING.

Statutes may not be construed by selecting some part thereof and disregarding other parts, but the whole must be read together.

At Law. Action by Nellie Wainwright, administratrix, against the Pennsylvania Railroad Company. On demurrer to plea in abatement. Overruled.

The plaintiff on May 6, 1918, instituted this action to recover damages under the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1916, §§ 8657–8665]) for the death of her husband, alleged to have resulted from injuries sustained on December 26, 1917, while in the service of the defendant, and while both were engaged in interstate commerce. The defendant filed a plea in abatement, alleging as causes: "(1) The Pennsylvania Railroad Company, defendant herein, is a common carrier now under control of

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the United States Railroad Administration. (2) The plaintiff herein, and the deceased, John Wainwright, resided, at the time of the accrual of the cause of action stated in the plaintiff's petition, in the city of Pittsburgh, state of Pennsylvania. (3) That the place of trial, to wit, city of St. Louis, state of Missouri, is far removed from the place where the plaintiff was injured and resided at the time of the accrual of this action, to wit, city of Pittsburgh, Pa.; that the trial of this suit in the city of St. Louis, Mo., will necessitate the summoning of men, to wit, Engineman N. Carlson, Fireman W. J. Corbet, Conductor W. Baker, and Brakeman J. Wainwright, now operating trains in points distant from the place of trial, and keep them for a considerable period of time from said work of operating trains, all of which will greatly prejudice the interests of the government in maintaining railroad traffic for war purposes. And the defendant further states that the above specifications of facts, enumerated above, constitute to all intents and purposes a case of abatement under General Order No. 26, promulgated by the United States Railroad Administration on May 23, 1918, and General Order No. 18–A promulgated by the United States Railroad Administration on May 18, 1918." To this plea the plaintiff demurred.

The general orders pleaded by the defendant were promulgated by the Director General of the United States Railroad Administration. General Order No. 18, made on April 9, 1918, reads: "Whereas, the act of Congress approved March 21, 1918, entitled 'An act to provide for the operation of transportation systems while under federal control,' provides (section 10) 'that carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law. except in so far as may be inconsistent with the provisions of this act or with any order of the President. * * * But no process, mesne or final, shall be levied against any property under such federal control; and whereas, it appears that suits against the carriers for personal injuries, freight, and damage claims are being brought in states and jurisdictions far remote from the place where plaintiffs reside or where the cause of action arose, the effect thereof being that men operating the trains engaged in hauling war materials, troops, munitions, or supplies are required to leave their trains and attend court as witnesses, and travel sometimes for hundreds of miles from their work, necessitating absence from their trains for days and sometimes for a week or more, which practice is highly prejudicial to the just interests of the government and seriously interferes with the physical operation of the railroads, and the practice of suing in remote jurisdictions is not necessary for the protection of the rights or the just interests of plaintiffs: It is therefore ordered, that all suits against carriers while under federal control must be brought in the county or district where the plaintiff resided, or in the county or district where the cause of action arose."

On April 18, 1918, this general order was amended by General Order No. 18–A, as follows: "It is therefore ordered that all suits against carriers while under federal control must be brought in the county or district where the plaintiff resided, at the time of the accrual of the cause of action or in the county or district where the cause of action arose."

As this action was instituted after the promulgation of General Orders Nos. 18 and 18–A, and no question of limitation can possibly arise, it is unnecessary to refer to or pass upon the effect of General Order No. 26, in disposing of these pleas. These general orders are claimed to have been made by authority vested in the President and the Director General designated by the President, by Appropriation Act Aug. 29, 1916, c. 418, 39 Stat. 645, and the act of Congress entitled "An act to provide for the operation and transportation systems while under federal control, for the just compensation of their owners, and for other purposes," approved March 21, 1918.

Brownrigg, Mason & Altman, of St. Louis, Mo., for plaintiff.

Fordyce, Holliday & White, of St. Louis, Mo., for defendant.

E. H. Seneff and D. P. Williams, both of Pittsburgh, Pa., amici curiæ.

TRIEBER, District Judge (after stating the facts as above). The demurrer to the plea raises two questions of law: (1) Assuming that the act of Congress authorizes the President and the agencies appointed by him to make these regulations, is the act warranted by the Constitution? (2) Does the act vest the power to make these regulations in the President or the Director General?

At the outset of this opinion it is proper to state that, as this action was originally instituted in a court of the United States, the question whether Congress may authorize the general orders in question to apply to the courts of the states is not involved, and therefore cannot be determined in this proceeding. What is stated in this opinion is necessarily intended to apply solely to actions instituted in the national courts. · Whether, under the war power, Congress may enact laws affecting the maintenance of actions in the state courts, can only be determined when it properly comes before the court. To express an opinion on that question in the instant case would be clearly obiter, and the court, for this reason, limits this opinion to actions instituted in the national courts.

[1] *Has Congress the power to enact this legislation, assuming that it vests the power claimed on behalf of the defendant?*

That Congress possesses the power to enact legislation of this nature, under the Constitution, cannot be questioned at this day. There are several grounds upon which it must be sustained.

1. In McCulloch v. Maryland, 17 U. S. (4 Wheat.) 316, 421 (4 L. Ed. 579), Chief Justice Marshall delivering the opinion of the court, it was held as a proper canon of the interpretation of the powers of Congress under the national Constitution, among others:

"Let the end be legitimate, let it be within the scope of 'the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

This rule of construction has never been doubted or questioned by any subsequent decision, but has been uniformly followed, whenever it has been before the courts, and must therefore be accepted as elementary in the construction of the national Constitution. That there is nothing in the Constitution prohibiting Congress from determining the venue in civil actions is beyond question.

Article 1, § 8, cl. 11, of the Constitution, grants Congress the power to declare war, and clause 12 of that section empowers it to raise and support armies. That, by virtue of these provisions of the Constitution, Congress may use all means which are, in its opinion, appropriate to that end and not prohibited by some provision of the Constitution, has, under the rule established in McCulloch v. Maryland, been settled in Miller v. United States, 78 U. S. (11 Wall.) 268, 20 L. Ed. 135, and Stewart v. Kahn, 78 U. S. (11 Wall.) 493, 506, 507, 20 L. Ed. 176; reaffirmed in Mayfield v. Richards, 115 U. S. 137, 5 Sup. Ct. 1187, 29 L. Ed. 334. In Stewart v. Kahn it was held:

"The measures to be taken in carrying on war and to suppress insurrection are not defined. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the

Constitution. In the latter case the power is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress."

The same principle was recognized in the Legal Tender Cases, 79 U. S. (12 Wall.) 457, 539 (20 L. Ed. 286), where it was held:

"Before we can hold the legal tender acts unconstitutional, we must be convinced they were not appropriate means, or means conducive to the execution of any or all of the powers of Congress, or of the government, not appropriate in any degree (for we are not judges of the degree of appropriateness), or we must hold that they were prohibited. This brings us to the inquiry whether they were, when enacted, appropriate instrumentalities for carrying into effect or executing any of the known powers of Congress, or of any department of the government. Plainly to this inquiry, a consideration of the time when they were enacted, and of the circumstances in which the government then stood, is important. It is not to be denied that acts may be adapted to the exercise of lawful power, and appropriate to it, in seasons of exigency, which would be inappropriate at other times."

See, also, the address of former Justice Hughes on the War Powers under the Constitution, 42 American Bar Association, 232.

Whether the exigencies existed when Congress enacted this statute was for that body to determine, and cannot be questioned by the courts, if there is any substantial ground therefor. McCulloch v. Maryland, supra; Lottery Cases, 188 U. S. 321, 355, 23 Sup. Ct. 321, 47 L. Ed. 492; McDermott v. Wisconsin, 228 U. S. 115, 128, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39. That there was substantial ground for the enactment of the statute requires no argument. The conditions so graphically described in the Legal Tender Cases (79 U. S. [12 Wall.] 540, 20 L. Ed. 286) prevail now, and it will conduce to brevity to refer to what was there said, without quoting it in this opinion.

That the act was enacted under the war power is not only apparent from its context, but it is expressly declared in section 16 of the act "to be emergency legislation, enacted to meet conditions growing out of war," and section 14 provides that the federal control of railroads shall continue not exceeding one year and nine months after the ratification of the treaty of peace.

2. Another ground upon which the act must be sustained is that the right to maintain an action in any particular court is always subject to the legislative will. It is only when one is deprived of all rights to maintain an action for the redress of his wrongs that the statute would be obnoxious to the Fifth Amendment to the Constitution. Congress has uniformly exercised that power by providing in what courts suits may be maintained, and in no instance has such an act been held void. Among the many is Act March 3, 1873, c. 226, 17 Stat. 509, authorizing the Attorney General to institute suits against the Union Pacific Railroad Company, for certain acts, in any Circuit Court of the United States. The constitutionality of this act was sustained in United States v. Union Pacific R. R., 98 U. S. 569, 25 L. Ed. 143. The Carmack Amendment to the Interstate Commerce Act, approved June 29, 1906 (34 Stat. 595, c. 3591, § 7, pars. 11, 12 [Comp. St. 1916, §§ 8604a, 8604aa]), authorizes an action against the receiving carrier, re-

gardless of the fact that the loss or damage sued for was caused by a connecting carrier. Its constitutionality was sustained in Atlantic Coast Line v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7. Act Feb. 24, 1905, c. 778, 33 Stat. 811 (Comp. St. 1916, § 6923), vested the exclusive jurisdiction of actions on bonds of contractors for the construction of public works in the courts of the district in which said contract was to be performed and executed. The validity of the act was sustained in United States v. Congress Construction Co., 222 U. S. 199, 203, 32 Sup. Ct. 44, 56 L. Ed. 163, Hopkins v. Ellington & Guy, 246 U. S. 655, 38 Sup. Ct. 423, 62 L. Ed. 924, and Ex parte Southwestern Surety Ins. Co., 247 U. S. 19, 38 Sup. Ct. 430, 62 L. Ed. 961. The Clayton Act, approved October 15, 1914 (38 Stat. 730, 737, c. 323, § 12 [Comp. St. 1916, § 8835k]), expressly authorizes an action by the government, not only in the district whereof the defendant corporation is an inhabitant, but in any district where it may be found or does business. Section 15 of that act (section 8835n) authorizes service of process on other parties than the offending corporation, who are properly joined, in any district where found. The validity of these provisions was sustained in Southern Photo Material Co. v. Eastman Kodak Co. (D. C.) 234 Fed. 955.

Every state of the Union has provided by statute the venue for civil actions in its courts. In some states actions may be brought only in the county where the defendant resides; in some, where the defendant resides or may be found. Some actions can only be maintained in the county in which the cause of action accrued; others, where the subject-matter of the action is situated; and in some states actions may be maintained in the county where either plaintiff or defendant resides. The various acts are referred to in 22 Encyc. of Pl. & Pr. 790 et seq. In United States v. Crawford (C. C.) 47 Fed. 561, 565, Judge Parker said:

"I have no doubt that Congress may provide for service of process out of the district, as this is a regulation of practice and subject to the legislative control."

This was cited with approval by Judge Morrow in United States v. American Lumber Co. (C. C.) 80 Fed. 309, and in Sidney L. Bauman, etc., Co. v. Hart, 192 Fed. 498, 113 C. C. A. 104.

3. Another ground upon which this provision of the act must be upheld is that the courts of the United States, inferior to the Supreme Court, are not established by the Constitution, but owe their existence and powers to Congress alone. That they possess no powers not granted by an act of Congress was determined as early as 1809 in Bank of United States v. Deveaux, 9 U. S. (5 Cranch) 61, 3 L. Ed. 38, and again in 1812 in United States v. Hudson, 11 U. S. (7 Cranch) 32, 3 L. Ed. 259, and uniformly adhered to ever since. A late case in which this ruling is reaffirmed is In re Wisner, 203 U. S. 449, 455, 27 Sup. Ct. 150, 51 L. Ed. 264. That Congress may increase or diminish their powers, or abolish them, is beyond question. It has done so a number of times. Judiciary Act March 3, 1875, c. 137, 18 Stat. 470, extended the jurisdiction of the Circuit Courts of the United States mate-

rially. Act March 3, 1887, c. 373, 24 Stat. 552, contracted it. The Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1087) increased it in some respects, and in others decreased it. By that act Congress abolished the Circuit Courts, and no one ever questioned the exercise of these powers by Congress. If Congress, by the act under consideration, has seen proper to authorize the contraction of the jurisdiction of the District Courts, by limiting the courts in which actions may be maintained, it has only exerted the power which has been exercised ever since the enactment of the first Judiciary Act, in 1789 (1 Stat. 73, c. 20), by the first Congress under the Constitution. Possessing this power, Congress may well determine in what courts actions may or may not be maintained.

The Constitution confers on the Supreme Court appellate jurisdiction, but "with such exceptions and under such regulations as Congress shall make." In Ex parte McCardle, 74 U. S. (7 Wall.) 506, 514, 19 L. Ed. 264, it was held that Congress could deprive that court of appellate jurisdiction, and the repeal of an Act of Congress granting appellate jurisdiction in certain causes deprived the court of the power to review judgments in such actions. This case has been followed as a correct interpretation of the powers of Congress in all cases involving this question decided since. Murphy v. Utter, 186 U. S. 95, 109, 22 Sup. Ct. 776, 46 L. Ed. 1070. In Dooley v. Pennsylvania R. R. Co. (D. C.) 250 Fed. 142, Judge Booth passed upon an act similar to this and sustained it.

The contention that the statute is void, because vesting administrative officers with legislative discretion or power, is without merit. Selective Draft Cases, 245 U. S. 366, 389, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856. It is therefore clear that the act, if it authorizes these general orders, is within the power of Congress under the Constitution.

[2] *Does the act of Congress grant this power to the President?*

Counsel for plaintiff contend that it does not, relying upon that part of section 10 of the act, which reads:

"Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law."

In the opinion of the court all this quotation means is that any person having a cause of action shall not, by reason of this act or any regulation made thereunder, be deprived of the right to maintain it in a proper court, if, under the state, federal, or common law, he is entitled to a legal remedy. It does not mean, as claimed, that, having a cause of action against the carrier, he has the right to institute it in any forum in which he could have brought it before the passage of this act. To meet the exigencies existing during the war, Congress has granted to the President the power to say that one shall not maintain an action in a forum where the natural effect of selecting such forum will be, in the language of General Order No. 18:

"That men operating trains engaged in hauling war materials, troops, munitions, or supplies, are required to leave their trains and attend court as witnesses, and travel sometimes for hundreds of miles from their work, necessitating absence from their trains for days and sometimes for a week

or more, which practice is highly prejudicial to the just interests of the government and seriously interferes with the physical operation of the railroads, and the practice of suing in remote jurisdictions is not necessary for the protection of the rights or the just interests of plaintiffs."

That the exercise of the right to maintain actions in a forum distant from the place where the witnesses reside will seriously interfere with the successful prosecution of the war cannot be open to doubt. How are the soldiers drafted under the Selective Draft Act to be transported from the interior to the seaports, if the operation of trains is to be interfered with in this manner? How are munitions, clothing, food, coal, and other supplies necessary to carry on the war, to be transported expeditiously, if the employés, without whom trains cannot be operated, are to be compelled to leave their employment to attend as witnesses at places hundreds of miles away from where their duties require them to be, whenever a person has, or imagines he has, a cause of action against the carrier, and for his convenience, or in some instances, perhaps, to prevent a proper defense, institutes the action in a court far distant from the district where the cause of action arose, and in a district other than that of the residence of the plaintiff at the time of the accrual of the cause of action? The fact that not only the plaintiff, but his witnesses, can more conveniently attend the court, if held at or near his home, or where the cause of action accrued, may well raise a doubt whether the selection of the foreign forum is always made in good faith. The amendment of General Order No. 18 by General Order No. 18-A was evidently intended to prevent a change of residence for the purpose of enabling a suit to be brought at a distance from where the plaintiff resided at the time of the accrual of the cause of action, as is so frequently done to enable one to maintain an action in a national court, instead of in the courts of the state of which the plaintiff and defendant were both citizens at the time of the accrual of the cause of action.

[3] But, aside from this, statutes may not be construed by selecting some part thereof and disregarding other parts. For a proper construction of a statute the whole of it must be read together, to ascertain the legislative intent. In the language of Mr. Chief Justice White in Van Dyke v. Cordova Copper Co., 234 U. S. 188, 191, 34 Sup. Ct. 884, 885, 58 L. Ed. 1273:

"We may not. in order to give effect to those words, virtually destroy the meaning of the entire context; that is, give them a significance which would be clearly repugnant to the statute, looked at as a whole, and destructive of its obvious intent."

The various provisions of an act should be read so that all may, if possible, have their due and conjoint effect without repugnancy or inconsistency. New Lamp Chimney Co. v. Ansonia Brass Co., 91 U. S. 656, 662, 23 L. Ed. 336; Aaron v. United States, 204 Fed. 943, 123 C. C. A. 265.

Applying this canon of construction to the act, and giving effect to every part of it, as is our duty, it is apparent at once how untenable this contention is. That part of section 10 applicable to the matter in controversy reads:

"Sec. 10. That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President."

Another provision of the act is section 9:

"And the President, in addition to the powers conferred by this act, shall have and is hereby given such other and further powers necessary or appropriate to give effect to the powers herein and heretofor conferred."

There is nothing in the general orders under consideration which deprives the plaintiff of her right to maintain an action against the defendant, but for reasons of public necessity, in a time of war, these regulations were made, because in the opinion of the President and Director General, for good and sufficient reasons, they are necessary to prevent serious interference with the physical operation of railroads under the control of the government and employed in the prosecution of the war. The act and regulations may well be sustained upon the ground that "salus populi supreme lex est." "The welfare of the people is the paramount law."

The demurrer to the plea is overruled.