BAKER et al. v. BELL. (No. 6299.)

(Court of Civil Appeals of Texas. San Antonio. Dec. 17, 1919. On Motion for Rehearing, March 3, 1920.)

1. RAILROADS ⊂⇒5½, New, vol. 6A Key-No. Series—RECEIVER OF RAILROAD UNDER FEDERAL CONTROL ENTITLED TO DISMISSAL FROM CASE.

In a servant's action for injuries on a railroad under federal control, it was error to deny a motion to dismiss receiver of the railroad, so that the case could be prosecuted against the Director General alone, under Order No. 50, Oct. 28, 1918, and Act Cong. March 21, 1918 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a—3115¾p.)

2. MASTER AND SERVANT ⊂⇒293(17)—REQUESTED CHARGE ON DUTY TO SWITCHMAN BETWEEN CARS NOT EQUIPPED WITH AUTOMATIC COUPLERS PROPERLY REFUSED.

Where the foreman of a switching crew knew plaintiff was attempting to couple cars not equipped with automatic coupler, necessitating going between the cars when the foreman gave "kick-back signal" a requested special charge, submitting the question whether the foreman when he gave the signal knew that plaintiff was between cars "and attempting to make the coupling," was properly refused, as making right of recovery dependent upon knowledge of foreman at very instant of time when it was negligent for him not to know.

3. MASTER AND SERVANT ⊂⇒125(6)—MASTER LIABLE IF BY ORDINARY CARE HE COULD HAVE KNOWN OF DANGER.

If by ordinary care a master who has sent a servant to do a perilous thing should have known of the danger, or by the exercise of ordinary care might have known, though actual knowledge was absent, he would be guilty of negligence if the situation was such that he might have known the danger to the servant by ordinary care.

4. TRIAL ⊂⇒351(5)—SPECIAL ISSUE AS TO PLAINTIFF'S KNOWLEDGE OF DEFECTIVE COUPLING PROPERLY REFUSED WHERE COVERED BY ISSUES SUBMITTED.

Where issue of contributory negligence was properly submitted, it would have served no useful purpose to submit either question whether

plaintiff, after discovering defect in coupling, notified foreman, or question whether plaintiff's knowledge of defect was sufficient to put a reasonably prudent person on notice that it was dangerous to go in behind car and attempt to couple, and there was no error in refusal to submit.

On Motion for Rehearing.

5. DAMAGES ⊚⟿132(12)—FOR LOSS OF ARM $25,000 EXCESSIVE.

For the loss of an arm by plaintiff switchman, who was 47 years old at the time of the accident and was earning $150 a month, a verdict of $25,000 is excessive, and will be reduced to $15,000.

6. APPEAL AND ERROR ⊚⟿1004(4)—VERDICT WILL BE HELD EXCESSIVE ONLY IN EXCEPTIONAL CASES.

The court on appeal, though believing that verdict is excessive, will not reduce it, unless there were such grave circumstances connected with it as to justify conclusion that duty requires the court on appeal to reduce it.

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Action by C. H. Bell against James A. Baker, receiver, and another. Judgment for plaintiff and defendants appeal. Reversed and remanded for new trial.

John M. King and John B. King, both of Palestine, and F. C. Davis and Marshall Eskridge, both of San Antonio, for appellants.

T. C. Mann and John L. Dannelley, both of Laredo, and M. J. Arnold, of San Antonio, for appellee.

COBBS, J. C. H. Bell, a resident citizen of Webb county, Tex., filed this suit in the district court of Webb county, against Jas. A. Baker, receiver of the International & Great Northern Railway Company, and Wm. G. McAdoo, Director General of Railroads, for personal injuries received while in the employ of the said Jas. A. Baker, receiver, and Wm. G. McAdoo, Director General of Railroads, on March 30, 1918. The plaintiff on this date was employed as a switchman, and at the time the injury occurred was engaged in switching in the yards at Laredo, Webb county, Tex.

The plaintiff was a member of a switch crew that was working under the orders and directions of one Johnson, who was acting as the foreman of the crew. While so engaged in working, it became the duty of this switch crew to go upon a certain track, located in the yards at Laredo, and to couple up to and bring out two empty cars that were located on this track. The particular duty of making this coupling fell to the plaintiff. Two unsuccessful attempts were made to effect the coupling, and the plaintiff went; in at the opening between the two cars that were to be coupled up and the cars and

engine to which they were to be coupled, and while he was between these cars, working with the coupling on one of the cars to be coupled up, the engine and cars came back, striking the two cars, and plaintiff's arm was caught between the cross knuckle of the coupling of the foremost of the two cars and the coupling of the car furthest away from the engine, crushing and mashing plaintiff's right arm, so that it was necessary to amputate this arm at the elbow.

One of the alleged grounds of negligence was, neither one of the couplings of the cars to be coupled on the ends where the couplings were to be made would couple automatically by impact, but necessitated a man to go between the cars to make the coupling, and the cars were not properly equipped with appliances to automatically couple by impact, thereby violating the law, and that was also negligence on the part of appellant.

Defendants answered with the usual answer by exceptions, and that appellee's injuries resulted from his own negligence and assumed risk. He knew of the dangers and continued in the service; was guilty of negligence, and invited, or was the cause of, the doing of all acts complained of by his fellow servants in undertaking to do work with defective appliances not known to his fellow servants, and he was thereby guilty of negligence in not informing them, so that his acts contributed to and were the proximate cause of his injury.

James A. Baker, the receiver, filed a motion to be dismissed from the suit by virtue of the fact that the International & Great Northern Railway Company, of which he was receiver, was at the time of the alleged accident in the hands of and under the control of the Director General of Railroads of the United States by virtue of an order promulgated by the Director General, under and by virtue of the act of Congress generally designated as the "Federal Control Act." U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p. The motion was overruled, and the case tried before a jury, resulting in a verdict and judgment in favor of appellee and against James A. Baker, receiver of the railway company, and Wm. G. McAdoo, Director General of Railroads, and his successor, Walker D. Hines, as Director General of Railroads, jointly and severally in the sum of $25,000, with 6 per cent. interest per annum from April 6, 1919.

[1] The first assignment and the six propositions thereunder challenge as error, in different forms, the action of the court in not sustaining the motion and dismissing the receiver from this case, and in permitting a judgment to be entered against him as such. From the date of the proclamation of the President, which became effective on December 28, 1917, the government, through the

⊚⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Director General appointed by the President to operate the railroads, has been in exclusive possession and control thereof, and was operating the International & Great Northern Railway Company on the 30th day of March, 1918, the date of the alleged injury. The railway, the carrier, is not before this court by any process of service or otherwise, unless James A. Baker, the receiver thereof, may within the meaning of the "Federal Control Act" be designated as carrier.

The railway company then exercised **no** authority whatever in its control and management, which was by former orders and decrees of the federal court passed to said receiver, James A. Baker, and was in the custody of the court and operated under its direction through its receiver. So it will be observed that neither the railroad nor its receiver occupied with the appellee at the time of the injury the relation of master and servant, and it will be observed the maxim respondeat superior has no place here. It was not the negligence of the railway or of its receiver at all, for surely it cannot be said they are to be held liable for acts of the government in operating the road independently of them. Under the provisions of the law the Director General has the very broadest possible powers conferred on him to manage and operate railroads. He may sue or be sued, or make himself party to any suit, direct and prescribe modes of procedure as to how he may be sued. This is made very clear by the acts of Congress, and especially by General Order No. 50, dated October 28, 1918. The act of March 21, 1918, provides, too, "that carriers while under federal control shall be subject to all laws * * * or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President." Section 10 (section 3115¾j). General Order No. 50 also provided for the dismissal of the carrier from suits, and to substitute the Director General. The plaintiff in this suit did not dismiss the receiver, but elected to join both in the same suit, and not sue either alone.

The decisions are not uniform on the question, some holding in effect that such a motion should be sustained and prosecuted alone against the Director General, and others to the contrary. Certainly there was no coordinate operation or dual authority established by the evidence. Muir v. Railway Co. (D. C.) 247 Fed. 888; Wainwright v. Railway Co. (D. C.) 253 Fed. 459; Cocker v. Railroad Co. (D. C.) 253 Fed. 676; Harnick v. Railroad Co. (D. C.) 254 Fed. 748; Rutherford v. Railroad Co. (D. C.) 254 Fed. 880; Dahn v. Director General et al. (D. C.) 256 Fed. 549; Jensen v. Lehigh Valley Ry. Co. (D. C.) 255 Fed. 795; Rhodes v. Tatum, 206 S. W. 114; Northern Pacific Ry. Co. v. N. D. 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 897; Brady v. C. & G. W. R. R. Co., 114 Fed. 100–107, 52 C. C. A. 48, 57 L. R. A. 712; Mardis v. Director General (D. C.) 258 Fed. 945; Haubert v. Baltimore & O. R. Co. (D. C.) 259 Fed. 361; El Paso & S. W. Ry. Co. v. Lovick, 210 S. W. 285; Jensen v. Lehigh Ry. Co. (D. C.) 255 Fed. 795; Dantzler Lum. Co. v. T. & P., 119 Miss. 328, 80 South. 770, 4 A. L. R. 1669; Lavalle v. Railway (Minn.) 172 N. W. 918, 4 A. L. R. 1659; McGregor v. Railway (N. D.) 172 N. W. 841, 4 A. L. R. 1635; Gowan v. McAdoo (Minn.) 173 N. W. 440; Railway v. Ryan, 214 S.W. 642; Louisville Ry. v. Steele, 180 Ky. 290, 202 S. W. 878; Franke v. Ry. (Wis.) 173 N. W. 701; Bryant v. Pullman Co., 188 App. Div. 311, 177 N. Y. Supp. 488; Johnson v. McAdoo (D. C.) 257 Fed. 757.

We cannot close our eyes to the fact that very soon the government may return the railroads to the owners, and at this time it is not regarded as profitable to go into any lengthy or extensive discussion of the situation. But in any case you may look to the government to provide for the payment of all claims incurred under its management. As the alleged injuries were committed after the property was taken from the receiver, and he had nothing whatever to do with its operation, instrumentalities, the service or the employment of the servants, it would be rather strange under such circumstances to call the receiver the master and apply to him the doctrine of respondeat superior.

No court has ever questioned, under the acts of Congress, the power of government, during the time of war and the necessity therefor, to sequester the railroads or any property as a war measure and operate them. Nor, so far as we know, has there been any formidable protest coming from the owners. There was a great international war going on over the seas, calling for the highest type of patriotism and Americanism—a call to arms and to the rescue and for help to save to the world that liberty, religious and civil, for which our forefathers fought and shed their blood, and there was none to deny the government anything. It took over these roads, through its Director General, by virtue of the acts of Congress and the President's proclamation, and hence became the master, and those operating the roads were completely displaced of its physical properties, together with all the servants, operatives, etc. The receiver was thus left without the means of defense that he would have had, had he been operating the road himself. He had no right of inspection, of spending money for repairs, or command of the men; no reports from employés as to condition of rolling stock; no corps of attorneys to defend or prosecute suits, or the right to secure the witnesses and obtain necessary information from them. These powers usual to railroads had all been taken away. The relation of master and

servant had passed from the receiver to the Director General.

We believe the motion should have been granted, and, we sustain this assignment.

[2] The fifth assignment complains that the court erred in not giving the sixth requested special charge:

"Did the foreman, Johnson, give a kick-back signal to the man operating the engine, knowing that plaintiff was between said cars and attempting to make the coupling?"

It is claimed that such charge embraced defendant's theory of the case, and it was error to refuse to charge upon an issue material to the defense, upon which reliance is placed. As a general proposition of law that is true, if the refusal of such charge is a denial of any of the rights of appellant involved in the issue. Now, the charge of the court, submitting issues of negligence and answers of the jury, is as follows:

Fourth charge: "Did the foreman, Johnson, give a signal which caused the cars to back up while C. H. Bell was between the cars working with the couplers? Answer: Yes."

Fifth charge: "Was it negligence on the part of the foreman, Johnson, to give a signal to back up, if he did, when Bell was between the cars? Answer: Yes."

Sixth charge: "If you have answered that Foreman Johnson was negligent, then was such negligence, if any, on the part of the foreman, Johnson, a proximate cause of C. H. Bell being injured? Answer: Yes."

The evidence showed that appellee was in the discharge of his duty, and at the time he was attempting to make the coupling the couplers were not provided with couplers which would couple automatically by impact, and appellee was required by his master to go between the cars to make it, which defect was a proximate cause of the injury.

[3] Johnson, the foreman, knew that appellee was attempting to make the coupling at time of signal; knew that appellee had given the stop signal and was in a dangerous situation, and Johnson gave the kick-back signal. The evidence, undisputed, showed that Johnson had knowledge of the previous attempts of plaintiff to couple the car; saw him endeavoring to couple; and this charge narrowed down to the very instant of the accident whether Johnson knew he was then attempting to make the coupling. It does not, in submitting the question of actual knowledge, also submit with it, further, if by ordinary care he should have known the danger to appellee. The jury might have found just at that moment he did not know he was there, and yet by the evidence could have found that he might have had reason to believe or know from the evidence he was there. Under the facts of this case, and the law, having sent him to do a perilous thing, it was his duty to know. As we understand the law in such cases to be, if by ordinary care the master should have known of the danger, or by the exercise of ordinary care might have known, though actual knowledge was absent, still he would be guilty of negligence if the situation was such as he might have known the danger to him by ordinary care. H. & T. C. v. Coleman, 166 S. W. 688; Railway v. Freles, 166 S. W. 91.

There was knowledge enough in the possession of Johnson, as by him admitted, of the presence of appellee at or just before the injury and of what he was attempting to do, for the jury to find that he was negligent in giving the signal before he ascertained that appellee was in a safe place. It would not do to single out and hold and say that, because Johnson did not know that appellee at the very instant was in the act of coupling the car that had a defective coupler, it would exonerate him from negligence. This charge was erroneous in more respects than one, for it would make appellee's right to recover dependent upon the fact at the very instant of time Johnson did not know he was there when it was negligence under the circumstances not to know, thereby exonerating appellant of negligence irrespective of the proximate cause or other causes of negligence found by the jury, such as the negligence of appellant in not having an automatic coupler that would have protected appellee, who did this particular service under the command of the master. Hardin v. Ft. Worth & D. C. Ry. Co., 100 S. W. 995.

[4] The sixth and seventh assignments will be considered together which seeks, first, to have the jury ascertain whether after appellee discovered the defects in the coupling he notified Johnson, and whether after his knowledge of the defect was sufficient to put a reasonably prudent person on notice it was dangerous to go in behind said car and attempt to couple. These questions, if answered as defendant desired them answered, would not have justified or supported a judgment for defendant. A finding that appellee did not notify Johnson of the defect in the coupler would not have constituted a finding that Johnson was not guilty of negligence. A finding that appellee knew of the condition of the coupler, and that this knowledge was sufficient to put a reasonably prudent person on notice that it was dangerous to go in between the cars, would not have constituted a finding that appellee was guilty of contributory negligence.

The issue whether appellee was guilty of contributory negligence was properly submitted in special issue No. 8. It would not have served any useful purpose to submit either of the issues the refusal of which is complained of. Assignments 6 and 7 are overruled.

The fourth assignment complains that the verdict of the jury, awarding to appellee $25,000 for the loss of an arm, is excessive.

In view of the age of appellee, we believe, for the loss of an arm, that sum of money to be excessive.

Aside from the error in refusing to dismiss the case as against Jas. A. Baker, receiver, and the fact that the verdict is excessive, we find no error in the record. The judgment is reversed in so far as it awards a recovery against said Baker, and judgment rendered, dismissing the case as to him. The judgment will be reformed so as to award a recovery against the Director General of Railroads for the sum of $15,000, if a remittitur in the sum of $10,000 is filed within 15 days; otherwise the judgment will be reversed in so far as it relates to said Director General, and the cause remanded for a new trial as against him.

## On Motion for Rehearing.

[5] Appellee presents a very earnest, ingenious, and lengthy motion for rehearing, endeavoring to sustain the verdict of the jury for $25,000 for loss of part of the arm of appellee. The appellee cites many authorities sustaining large verdicts, and contrasts this decision with other decisions in which large verdicts are sustained by the courts, but fails to exhibit any precisely similar to this case with so large a recovery for like injuries. The appellant, likewise, has filed a very complete and full reply, and equally as lengthy. They both confine themselves to a discussion of the authorities of the courts in passing on large and excessive damages, with a comparison of the decisions of the courts thereon, contrasting the amounts with each other and the nature and character of the injuries with each other and the amounts allowed to stand, in comparison to the action of this court herein.

We have examined all the authorities cited accessible, and many others besides. In the hope to satisfy appellee's counsel, as well as ourselves, we have given much time to considering the questions and authorities presented. It is no easy matter to fix a correct standard to govern in such cases, and no attempt will be made to depart from that already established and understood. It would be far better for the trial judges to give the subject their careful consideration, to the end that appellate courts be relieved of that duty. At no time was there any disposition shown on the part of the courts to evade their duty when called upon to reform judgments excessive in amounts, or indicating that they were the result of passion or prejudice, when properly presented or too apparent to avoid. See a few cases: Houston & Great Northern Ry. Co. v. Randall, 50 Tex. 254; Darcy v. Turner, 46 Tex. 30; I. & G. N. Ry. Co. v. Underwood, 64 Tex. 463; G., C. & S. F. Ry. Co. v. Dorsey, 66 Tex. 148, 18 S. W. 444; G., C. & S. F. Ry. Co. v. Gordon, 70 Tex. 80, 7 S. W. 695; Texas & Ft. Smith Ry. Co. v. Hart-

nett, 33 Tex. Civ. App. 103, 75 S. W. 809; G., H. & S. A. Ry. Co. v. Pigott, 54 Tex. Civ. App. 367, 116 S. W. 841; G., H. & S. A. Ry. Co. v. Stevens, 94 S. W. 397.

For instance, in Railway v. Pigott, supra, in an opinion of this court by Justice Neill, he did not hesitate to declare the verdict excessive and required a remittitur.

In Railway v. Hartnett, supra, Mr. Justice Neill said:

"We have not been able to find a single case where damages in the amount assessed by the verdict have been adjudged any one for injuries similar to those sustained by the plaintiff."

In the Hartnett Case the left arm was cut off below the elbow joint. The jury rendered a verdict for $15,000. The judgment was affirmed by this court conditioned upon a remittitur of $5,000.

In Railway v. Gordon, supra, Judge Stayton reversed and remanded the case because the verdict was excessive.

In the Dorsey Case, supra, the rule as applied by the Supreme Court was further expressed, as follows:

"What is compensation for such an injury is ascertained by the average judgment of reasonable men. This, again, is generally best determined by the sworn 12 and the presiding judge. Yet to revise their judgment is a part of the jurisdiction and duty of this court. The jury's verdict, approved by the trial judge, is potent evidence of the general average judgment of men. But the law will not allow us to accept it as conclusive. Our opinion may be invoked and must be then pronounced."

Judge Stayton so expressed himself again in the Underwood Case, supra, and also in the Turner Case, supra, both of which cases were reversed and remanded on account of excessive verdicts.

In the case of Randall, supra, our Supreme Court said:

"But while so broad a discretion is necessarily permitted to the jury in fixing the amount of damages for such injuries as those referred to, it is unquestionably not without limitation or control. When the verdict appears to be palpably and manifestly excessive, it is not only within the power, but is unquestionably the duty, of the court in which the case is tried to set aside the verdict and send the case to another jury; and if it is made to appear here that the court below erred in refusing to do so, this court should reverse and remand the case for another trial. * * * However, the right of the court to set aside the verdict for this reason is in some instances absolutely essential to the proper administration of justice, and should be exercised without hesitation in all cases where the facts and circumstances demand it, yet it is never done except with the utmost circumspection and caution. * * * Still we do not feel prepared to say, on comparison of the verdicts in similar cases which have come under our observation, where applications for new trials have been urged on account of excessive damages, which is the only criterion for our guidance in the absence of anything in

the record to indicate that the jury was actuated by prejudice, passion, or other improper consideration."

Appellee cites the opinion of Judge Fly in the Stevens Case, supra, with approval, as being one of the most logical and clearest opinions on the subject in our reports, governing the question of what must occur before the appellate courts will substitute their conclusions for the finding of a jury on the subject, as laying down "the great fundamental principles," etc. The counsel for appellant is equally as pronounced in his endorsement of that opinion, as appellee is. Counsel for appellee quotes from a portion of the Stevens Case, and we shall here quote further from Judge Fly's opinion in that case, which is as follows:

"Of course, the amount of the verdict alone might be such as to conclusively demonstrate that improper motives · influenced the jury in returning it. The amount found in this case we conclude, after a review of numerous cases, cannot, in the absence of other evidence, be held to demonstrate passion or prejudice on the part of the jury. * * * Cases might arise in which the evidence would fully sustain every essential point in the plaintiff's case, and yet the amount of the damages be clearly against the preponderance of the evidence, and under such circumstances this court would be empowered to require a remittitur as would reduce the verdict to such sum as would be deemed proper and right. * * * The unreasonableness of the amount of the verdict would of itself be sufficient evidence of passion or prejudice on the part of the jury."

We are not inclined in the least to vary from that rule, nor have we in this case. We have examined, perhaps, a hundred cases together with those cited by the respective parties, and from an examination there are rare instances in which very large judgments are rendered for the loss of an arm, and rare indeed where it amounts to $25,000, even when accompanied by other permanent injuries, and verdicts for $15,000 are in a great minority, and generally in cases where the loss of an arm is accompanied by other serious injuries, or where the party was unusually young, capable, and healthy. We refer to such injuries as where the arm was amputated and a foot was amputated and severe and serious wounds elsewhere inflicted on the same party at the same time.

The testimony of the plaintiff was that he was 47 years of age at the time of the accident, was acting switchman at a salary of $150 per month, his occupation really being locomotive engineer, had been operating trains in Mexico, and came out just before the trouble there. In that occupation he was earning from $175 to $250 per month, gold; had been employed by the International & Great Northern to come to San Antonio to work as engineer running out of there, a couple of weeks before the accident, and his conpensation would then run from $175 to $250 per month; has not been able to run an engine as engineer since, nor brake, nor switch. Since the accident he has made a little money as conductor for laborers, delivering them in different places in the country, and has made in the neighborhood of $175 or $200, not every month, but while he was doing the work. He says the accident "mashed my right arm off." This, he says, was the declaration he made at the time, "they have cut my arm off." There is no testimony from any one explaining the nature of the injury, other than loss of his arm and suffering. He further stated:

"You asked me if there is any movement of the stump beyond my control. * * * The end of my stump is palpitating all the time just like you see it there."

From the testimony of the plaintiff himself there does not seem to have been any further explanation than he makes as to the nature and character of the injuries. There is, from his own statement, a stump of his arm left. In the motion for appellee it is stated the arm was cut off above the elbow, and in the answer for appellant it is stated the arm was cut off below the elbow.

There was proof of suffering and pain, of course, which necessarily would be expected to result to any one from such an injury, but in this day the loss of an arm is not an unusual occurrence, and we assume, of course, all of the consequences and pain resulting therefrom and the nervous condition of the injured party existed.

[6] Our attention is also called by appellee to the case of Ward v. Cathey, 210 S. W. 292, as authority for the position that the jury might take into consideration that wages have been increased and are increasing, and that plaintiff, as an engineer, would have enjoyed the increased remuneration incident thereto; also that the value of a dollar has decreased and plaintiff would suffer the effects and result thereof. Counsel must not lead us into too broad a field of speculation. The true test was for the jury, at the time of the trial, to take into consideration what sum of money would compensate appellee for his losses. The high price of living and the purchasing power of a dollar is common knowledge, and doubtless may be considered. It may or may not be temporary. The wages of employés may or may not likewise be correspondingly increased, as the dollar is cheapened. This is all pure speculation, and applies to all men engaged in the employment of railroads, public or private institutions alike. In considering the verdict of the jury in this case, there was, and is now, no element, that we should have considered, that we did not and have not considered. We have given it unusual thought and investigation. We would hesitate very much be-

fore reducing a verdict, even though we believe it to be excessive, where the 12 jurors returned it and the judge let it stand, unless in our opinion there were such grave circumstances connected with it as to justify us in the conclusion that our duty required us to reduce it. It is a difficult question to determine in any case.

Mr. Bell has not shown that at the age of 47, having attained the rank of engineer, that he would have received a future promotion, and leaves it incidentally to be inferred that because of the change of his position he would attain higher promotion. It is rather improbable than otherwise that he would at that age. In a few years, at his age, the presumption, rather would be that his earning capacity would be decreased rather than increased, but of course this is a mere speculation, and within the province of the jury to determine under all the circumstances before it. The measure of damages in this case would be the earning capacity of the appellee measured by what his former capacity was, whether in cheap dollars or dear dollars, but in no case double or triple of what he could have earned, or any amount except the actual amount that he could earn, and there is no evidence to show or inference to be drawn that the salary would continue to keep pace with the further high cost of living.

No one who reads the papers can fail to observe the efforts made and failure to increase, to any considerable extent, the wages of locomotive engineers, firemen, and switchmen in proportion to the depreciation of the value of the dollar, and probably the highest point has been reached. At any rate the matter is too speculative to lay down any rule along that line to control the courts.

We do not think that reasonable minds can very greatly differ in regard to a man's earning capacity on account of the loss of an arm, or part of an arm, certainly not diminished to anything like 75 per cent. Accident boards and insurance companies have made a schedule to govern in the loss of limbs and the diminished capacity of earning.

Appellee, as is usually the case, undertakes to compare his injuries to those disclosed in opinions of the courts as having been suffered by others, and by comparison of injuries to those disclosed in opinions of the courts as having been suffered by others, and by comparison of injuries and amounts seeks to show that no remittitur should have been required of him. Cases in which large verdicts have been permitted to stand are always selected for comparison by appellees, and it is assumed that, although the courts may err in other respects, they never err in favor of plaintiff with respect to the size of a verdict. The cases specially selected by appellee for purposes of comparison are the McElroy, Johnson, and Harris Cases.

The McElroy Case, 149 S. W. 428, is not in point, and not similar to Bell's loss of part of his arm. McElroy was not removed from the scene of the injury for an hour and a half; his leg was amputated the next morning; he was laid up 10 months before he was able to go back to work; he paid the doctor and hospital $164; his employers for whom he had worked 25 years' gave him employment as night watchman, the duties of which position required him to be on his feet and move about, which caused him much pain. It appeared from his testimony that he suffered continuously, and was unable to sleep.

In the Johnson Case, 136 S. W. 275, the injury to the plaintiff's leg was such as to render it useless, as well as an incumbrance or deformity.

A statement of the most important facts of these cases discloses that there exists no fair basis for comparison, and illustrates the often stated proposition that each case must be decided on its own facts.

In the Harris Case, 172 S. W. 1129, the injuries were much more severe, consisting of the loss of his leg below the knee, nervous shock, etc., and the mangling of a foot, which caused the leg to be amputated, from all of which he declined in health, and became a wrecked invalid. He also received a severe shock, internal injuries to his heart and head, back injured, right eye affected and sight impaired; also an operation for mastoid trouble became necessary. The verdict in that case was for $25,000, and was reduced to $20,000. He was a conductor.

We will call attention to a few other cases.

In the case of Texas & Ft. Smith Ry. v. Hartnett, 33 Tex. Civ. App. 103, 75 S. W. 809, the party injured was a locomotive engineer. His arm was cut off near the elbow joint, causing great pain and mental anguish. The opinion was written by Judge Neill. The verdict was for $15,000, held to be excessive and reduced to $10,000.

In the case of G., H. & S. A. v. Young, 45 Tex. Civ. App. 430, 100 S. W. 993, the party injured was a practicing physician and surgeon, healthy at the time of the accident. His collar bone was broken in two places, his right arm was broken, and one end of the bone run under the other where it continued to press under the hollow of the arm. His shoulder blade was broken, leg injured and back injured, and pulse rate since the injury as high as 135. His right arm was shortened, and he has been unable to perform delicate surgical operations. The injury was permanent, and impaired his earning capacity, which was from $4,000 to $8,000 per year. The opinion in that case was by Judge Fly, and neither passed upon the verdict as excessive or otherwise. The doctor was the same age of Bell; engaged in a profession that benefits by increasing years, an occupation that requires the highest degree of

skill and physical capacity. Verdict, $15,000.

In the case of T. & N. O. v. Middleton, 46 Tex. Civ. App. 497, 103 S. W. 203, the injured party was a locomotive engineer, 44 years old, earning capacity $1,800 per year. He was injured by having a rib broken, dislocated, and detached from his breast bone, permanently injured in his breast, back, heart, and lungs, and since the accident has been unable to lift a weight with his left hand, and when he attempts to do so it causes him to spit blood. His condition is permanent. The verdict of the jury was $10,000. The opinion was by Chief Justice James of this court.

Railway Co. v. Groves, 44 Tex. Civ. App. 63, 97 S. W. 1084, party injured, 21 years of age, earning from $80 to $100 per month; result of accident, lost right arm between shoulder and elbow; sufferings great, not entirely ceased date of trial. $10,000, while not held excessive, was commented upon as being unusually large.

American Steel Foundries v. Sech (Ind. App.) 122 N. E. 347, a recent case decided by the Appellate Court of Indiana, an able-bodied man, 32 years of age, with a life expectancy of 34 years; an experienced machinist, earning $2.50 per day; lost his right arm. Verdict of $5,000 was not set aside as being inadequate.

Knock v. Tonopah & Goldfield R. R. Co., 38 Nev. 143, 145 Pac. 939, L. R. A. 1915F, 3, the Supreme Court of Nevada held a verdict for $25,000 in favor of a railroad conductor and brakeman 29 years of age, earning $170 per month, for damages sustained by reason of his right arm being crushed, necessitating amputation just below the elbow, excessive and affirmed the case upon condition $10,500 was remitted. This case is in point with the present case.

The record discloses here that, within the short time of 15 minutes after the jury were instructed to consider the case, they returned with a verdict for the entire sum sued for. This, to our mind indicates very little consideration of this case. It may be that the jury had time to read the charge, consider the testimony, and discuss the case. It is not often the case, in the experience of lawyers, that juries consisting of 12 men so quickly agree upon such a verdict. It may be that it can be done, but in view of the amount of the damages assessed and the extent of the injuries in this case, we are inclined to believe that the jury's verdict should not have that potent force and effect that is contended by appellee should be given to this verdict. Because counsel for appellee has challenged the opinions of this court in regard to affirming excessive judgments, we have undertaken to review the cited cases to ascertain upon what theory, or upon what case counsel relies in making such statement, and we do not find a single parallel case where such a judgment has ever been allowed to stand.

We overrule the motion.