## ST. LOUIS, B. & M. RY. CO. et al. v. McLEAN. (No. 6711.)*

(Court of Civil Appeals of Texas. San Antonio. March 22, 1922. Rehearing Denied April 19, 1922.)

**1. Continuance ⚍22—Denial of continuance held not reversible error.**

Denial of defendants' motion for a continuance was not reversible error where a witness for defendants was unable to attend trial because of illness, and it was agreed by plaintiff that his testimony on a former trial could be used as though he were personally present, but court refused to let the defendants read certain portions of the testimony unless the plaintiff be permitted to have the remainder read to the jury, and the defendants did not attempt to procure a deposition, and the witness was not under subpœna, and the omitted testimony would have made no substantial difference.

**2. Railroads ⚍5½, New, vol. 6A Key-No. Series—Director General suable as master of employees.**

The Director General of Railroads operating trains of two railroads over the line of one road was the master of all the trainmen of each road constituting units of the federal system, and a suit for injury to a trainman in a collision was properly maintained against the Director General, and the judgment was payable out of appropriations by the government for that purpose.

**3. Trial ⚍352(1)—Special issue as to whether the Director General or any of his agents were guilty of negligence charged approved.**

In an action for the death of a railroad conductor, a special issue, "Was the Director General of Railroads, through his servants and employees, guilty of any of the acts of negligence in the operation of the trains charged in plaintiff's fourth amended original petition?" held proper.

**4. Trial ⚍351(2)—If special issue was objectionable to defendants, they should have submitted their theory by requested charges.**

If there was error in a special issue submitted, defendants, appellants, should have submitted their theory by requested charges.

**5. Evidence ⚍492—Testimony as to speed of train held admissible in action for death of conductor caused by wreck.**

In an action for the death of a railroad conductor resulting from a rear-end collision during a fog, testimony that train was going 25 miles an hour held not objectionable.

**6. Evidence ⚍472(4)—Opinion evidence covering a matter of railroading which was a jury question held inadmissible.**

In an action for the death of a railroad conductor caused by a rear-end collision during a fog, refusing to allow witness to testify that in practical railroading during a fog, where an engineer has right to follow in five minutes, and finds no flagman, fusee, or torpedo, failure to find those things conveys the idea that the forward train has gone more than five minutes, was not error, for the matter was for the jury and the rules were in evidence.

**7. Appeal and error ⚍1004(1)—Amount of verdict held not to show passion, sympathy, or prejudice on the part of the jury.**

In an action for the death of a railroad conductor caused by a rear-end collision, record held not to show that amount of verdict was the result of passion, sympathy, or prejudice on the part of the jury, and contrary to the weight and preponderance of the evidence; the jury having found the deceased also negligent.

**8. Master and servant ⚍278(18), 281(12)—Findings of negligence and contributory negligence causing collision on railroad sustained.**

In an action for the death of a conductor in a rear-end collision during a fog, evidence held sufficient to sustain findings of negligence and contributory negligence in not dropping a fusee as one of the causes of the collision.

**9. Appeal and error ⚍218(2)—Appellant may not complain of special issue where not offering or presenting others.**

Appellants may not object to special issues where they contented themselves merely with objecting without offering any assistance to enable the court to present other issues.

**10. Evidence ⚍472(1)—It is proper to exclude expert opinion on matter on which the jury should form its own opinion from the evidence.**

It is proper to refuse expert testimony in respect to testimony properly before the jury whose duty it was to form their own opinion and judgment.

**11. Death ⚍99(4)—Damages held not excessive.**

A verdict awarding $27,500 to the surviving wife and child and $2,250 to the surviving parents of an experienced railroad conductor 40 years old earning between $200 and $250 per month held not excessive.

Appeal from District Court, Nueces County; W. B. Hopkins, Judge.

Suit by Hester McLean individually and as administratrix of the estate of W. F. McLean, deceased, for the benefit of herself and as next friend of deceased's minor child, Helen Josephine McLean, against the St. Louis, Brownsville & Mexico Railway Company and another, in which James C. Davis, Director General of Railroads and Agent, answered and defended. Judgment for the plaintiff, and the defendants appeal. Affirmed.

H. R. Sutherland, of Corpus Christi, Dodson & Smith, of Laredo, E. H. Crenshaw, Jr., of Kingsville, and J. D. Todd, of Corpus Christi, for appellants.

Boone, Pope & Savage, of Corpus Christi, for appellee.

---

⚍For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted June 7, 1922.

COBBS, J. This suit was brought by Hester McLean, surviving widow of W. F. McLean, deceased, individually and as administratrix of the estate of said W. F. McLean, deceased, for the benefit of herself and the minor child, Helen Josephine McLean, and as next friend of the latter, against the St. Louis, Brownsville & Mexico Railway Company, Texas-Mexican Railway Company, and the Director General of Railroads for damages for negligently causing the death of said W. F. McLean, caused by the collision of said two trains operated on the Texas-Mexican Railway track by the St. Louis, Brownsville & Mexico Railway Company, both operated by the Director General of Railroads of the United States Government. In addition to these allegations, the petition alleged very fully all the specific acts of negligence.

Though both roads were operated jointly by the same Director General for the United States government, each road, through its same Director General, made and filed separate defenses and filed separate briefs here, all in the name of each separate named carrier. Upon motions and exceptions presented in each of said carrier's name by James C. Davis, Director General of Railroads and Agent so designated by the President under the provisions of the act of Congress for the operation of both roads besides all others, in his dual capacity, properly caused said two named corporate defendents as such to be dismissed from the cause, thus leaving for the sole defense the said named Director General. His answer as Director General of Railroads and as Agent in respect of the operation of the Texas Mexican Railway was filed separately. And the same Director General for both carriers in the same capacity answered as Agent in respect of the operation of the St. Louis, Brownsville & Mexico Railroad.

The answers set up very fully for each its separate defense as though they were separate entities, and not under government control. Each pleaded the negligence of the deceased, McLean, as the sole contributing cause of his death, and in respect of the operation of the St. Louis, Brownsville & Mexico Railroad he pleaded the contributory negligence on the part of the deceased, W. F. McLean, in failing to obey established rules requiring a conductor, whose train is delayed in a fog which stops as did McLean's train, to send signals of warning to the rear in order to prevent a possible train from colliding with his train.

The court overruled all pleas, demurrers, etc. The case was tried before the court with a jury on special issues, and, on return of the verdict judgment was entered thereon as follows: Hester McLean individually for $12,500, and as next friend for Helen Josephine McLean for $15,000, and in favor of L. B. Mc-

Lean and his wife, Josephine McLean, the father and mother of deceased, $2,250.

[1] The first error assigned by appellant, in respect to the operation of the Texas Mexican Railway, is predicated upon the inability of the witness J. S. Rumsey to attend the trial and testify in behalf of appellant, because of his confinement in a hospital at Hot Springs, Ark. Rumsey was in the employ of the Texas Mexican Railway Company and under contract to attend and had promised to do so. He was notified of the setting of the case on the 7th day of September, but was taken ill on Saturday, September 3d, when he left for Hot Springs, Ark., where he underwent an operation September 7th, which enforced his stay in the hospital at Hot Springs some weeks. It was not known to the appellant until September 6, 1921, and its seriousness was not known until September 7th, communicated by the operating surgeon by telephone.

A written contest was filed by appellee, challenging the diligence because at a former trial of this case, in January, 1921, the witness, being present, testified and was fully interrogated by the attorneys of the Texas-Mexican Railway Company, and appellee agreed that appellant could use the stenographic report of that testimony. This witness had never been under process, but had previously testified in behalf of appellants at length and was examined and cross-examined, all testimony taken down and transcribed by the official court reporter. Appellee agreed that the same could be used by appellant on the trial as the testimony of said witness as though he were personally present testifying, subject only to such legal objections to the admissibility as were urged to it in the last trial, apparent from the stenographic report. Whereupon the motion to continue was overruled.

Because the court refused to let appellants read certain portions of the testimony, unless appellee be permitted to have the balance read to the jury, appellants refused to read any part.

Appellants, strictly speaking, showed no satisfactory legal diligence. The deposition of the witness had not been taken, but we cannot see from anything on the face of this record any injury done appellant. This witness had previously testified fully upon direct and cross examination, and his testimony was preserved, and, being sick and outside of the state, it was agreed that his testimony might be used on the trial in lieu of his presence. The appellant never agreed to that, but, the motion being overruled, undertook to select portions of the testimony of this absent witness to read without permitting all his testimony to go before the jury.

If the motion presented any merit at all, it is not apparent. It is not shown where there was any additional or new matter pre-

sented by his testimony other than transcribed from his former testimony that appellee agreed he might read from that record, and if he read any part of it the whole should have been read. The appellant was not denied any valuable right. It is not shown wherein by reading a part of his testimony it would have made out his case, but that in reading all the testimony it would have injured him, and for that reason the court erred. Would that not be true if he had testified again in person or by deposition that there would not have been any substantial difference? We see no abuse of discretion, and overrule this assignment. Besides, the jury found McLean guilty of negligence and diminished appellees' recovery for that reason.

We will not dispose of nor discuss the dual set of assignments and propositions in the order as presented. That would be most difficult, as the attorneys for the Director have seen proper to plead separately, assign errors separately, and file separate briefs and arguments, but we will try and pass on all the material questions raised by the same appellant the same as though separately discussed.

[2] The first question urged here is to determine upon whom is imposed the duty and liability to discharge the obligations; that is, when caused by the negligent operation of carriers under the operation of the United States government. We have heretofore held in a number of cases (Baker v. Bell, 219 S. W. 245; G., H. & S. A. v. Wurzbach, 219 S. W. 252) that the doctrine of master and servant did not apply to the roads so operated in their name as separate entities, but that the government operating alone was the master.

A railroad so operated, through the United States government, does not in any way change its relation or its duty to the public or its liability to injured persons and claimants. While this character of operation and governmental control of railroads was new in this country and has, we dare say, proven unsatisfactory, it is now very well understood. With the light given us by the many authorities cited, federal and state, it is apparent that there is one united system for the operation of consolidated railroads gathered together under one common head or management, in which the different units, perhaps, keep a separate system of accounting for the information, disposition, and control thereof, and settlement, through the Director General, for claims growing out of the operation of each carrier. The idea is very much simplified and the matter made somewhat plain by the opinion delivered by Mr. Justice Brandeis for the Supreme Court in the case of M. P. Ry. Co. v. Ault, 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087, in which he likens the governmental control and operation unto a

receivership and the distribution of funds as in admiralty cases. See, also, Globe & Rutgers Fire Ins. Co. v. Hines, Agent (C. C. A.) 273 Fed. 774. This last case is in various features somewhat on parallel lines with this case, but that suit was in admiralty. The Director General was operating both roads here at and upon the very identical place and time of the injury. W. F. McLean, when killed, was operating a passenger train of the St. Louis, Brownsville & Mexico Railroad over the tracks of the Texas-Mexican Railway from Corpus Christi to Robstown, and was killed by the train of the Texas-Mexican Railway operating and crashing into the former train, both operated on the same line under the direction of the same Director General of Railroads, under some arrangement by him, made perhaps with some contribution of expenses, etc. The train crew of each road were the servants of the Director General. It might be likened to a trunk line operating its trains over a leased line by the same lessee and same general management. As the trains were being operated under his general management, and the funds from operating both roads coming to his hands, he should find no great difficulty in paying the judgment out of funds that the government has set aside for that purpose, and, if necessary, charge to the proper carrier's funds.

It is true McLean was operating a train belonging to the St. Louis, Brownsville & Mexico Railroad, and occupied no position of servant to the Texas-Mexican Railway. Obviously he did not, for the distinct reason that he occupied the position of servant to the Director General of Railroads, and to no carrier. Appellant contends those two roads were operated as separate entities. If they were, it is because the Director General so operated them. They were so operated in name, at the will of the government, through the Director General, master superior to all the servants employed on those two several lines.

Under the original act, as said in Missouri, Pac. Co. v. Ault, 256 U. S. 561, 41 Sup. Ct. 596, 65 L. Ed. 1087:

"In the absence of explicit direction, it was perhaps natural that those wishing to sue the carrier should have named the company as defendant when they sought to hold the government liable. It doubtless seemed, as suggested in McNulta v. Lochridge, 141 U. S. 327, 331, 332, 12 Sup. Ct. 11, 35 L. Ed. 796, that suit should be brought against the transportation company 'by name "in the hands of" or "in possession of" a receiver,' or Director General. All doubt as to how suit should be brought was cleared away by General Order No. 50 which required that it be against the Director General by name."

Among the cases cited in point on that subject, in the note in that volume of United State Supreme Court Reporter is Galveston,

etc., Railroad v. Wurzbach (Tex. Civ. App.) 219 S. W. 253, which follows Baker v. Bell (Tex. Civ. App.) 219 S. W. 245, both opinions by this court.

In restoring the roads to the possession of the owners, the government set aside and made provision by the appropriation of large sums of money to be used in the settlements of such judgments as are obtained. As neither of the roads or its treasury is to be depleted by the payment of this judgment, it must be obvious that the suit was properly maintained, and the judgment must so run as to require the payment out of the fund in the sole control of the Director General, as stated, set apart for that purpose.

No case abated nor cause of action terminated or lost against the government's operation of the carrier because the properties were restored to the original owners, but that right was continued in full force "against an agent designated by the President for such purpose." Globe & Rutgers Fire Ins. Co. v. Hines (C. C. A.) 273 Fed. 780. In further elucidating, the court said in that case:

"It seems to us that the result of all this was that the railroad properties within the continental United States, while federal control lasted, were organized into a unified national system of transportation under a single head, the Director General of Railroads. As the Supreme Court, speaking through Chief Justice White, in Northern Pacific Ry. Co. v. North Dakota, 250 U. S. 135, 148, 39 Sup. Ct. 502, 505 (63 L. Ed. 897), declared, the acts of Congress and the President's proclamation thereunder gave 'no divided but a complete possession and control' to the United States 'for all purposes as to the railroads in question.' How, he asked, 'can any other conclusion be reached, if consideration be given the comprehensive provisions concerning the administration by the United States· of the property which it was authorized to take, the financial obligations under which it came and all the other duties and exactions which the act imposed, contemplating * * * one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace for the period provided the private ownership theretofore existing?"

[3, 4] In the third assignment and proposition thereunder complaint is made generally that the court erred in not sustaining the objection of Texas-Mexican Railway to special issue No. 1 in the general charge of the court:

"Was the Director General of Railroads, through his servants and employees, guilty of any of the acts of negligence in the operation of the trains as charged in plaintiff's fourth amended original petition?"

The first objection is:

(a) "That there was no legal evidence of any act of negligence pleaded to justify the issue"; (b) the form is prejudicial and submits "an issue which is undisputed"; (c) there is no distinction permitted between the Director General and Agent in respect to the operation of each separate railway by him as a separate entity; (d) the court does not inform the jury what the issues are, but leaves the jury to determine from the pleadings; (e) it permits the jury to find negligence depending upon issues which are solely pleaded against the Director General and Agent in respect to the operation of the two roads and which issues were barred by the statute of limitations pleaded in the fourth paragraph of his amended answer; (f) "it permits the jury to find negligence alleged on any act of negligence, though they may believe there to be no evidence of negligence, except in respect of the operation of one of the railways."

The Director General, speaking through the Texas-Mexican Railway (who by his own motion was dismissed from the case, and who is now presenting these objections as the railway), did not ask the court to give any special charge to correct the errors, if any. Charges of like form, referring the jury to the pleadings, have been approved so often by appellate courts in this state as to become the settled law, and will not be disturbed here. United Land & Irrigation Co. v. Fleming, 225 S. W. 843; Freeman v. McElroy, 149 S. W. 429; K. C., M. & O. Ry. v. Finke, 190 S. W. 1145. Taking the charge as a whole in connection with the other issues submitted, we see no reason for complaint. If there was, then appellants should have submitted their theory by requested charges. This assignment is overruled, and for the same reason assignment 3a is overruled.

We do not think special issue No. 11 is on the weight of evidence and suggests to the jury that there was negligence on the part of the defendants, and hence the fourth. assignment of error is overruled.

We overrule the fifth assignment of error, complaining that the court erred in rendering judgment against James C. Davis, Director General of Railroads and Agent under the provisions of section 206 of the act of Congress approved February 28, 1920 (41 Stat. 461) and the alleged cause of action arose out of the operation of the St. Louis, Brownsville & Mexico Railway and the Texas-Mexican Railway.

[5] We overrule the sixth assignment, complaining that the court erred in overruling the motion to strike out the testimony of the witness J. S. Byerly to the effect that when the Texas-Mexican Railway train struck the St. Louis, Brownsville & Mexico Railway train it was going 25 miles an hour, because based upon a presumption. We think the testimony was correctly admitted. In fact, such proof had already been made without objection by the servants of appellant. He saw the trains running, and the second train was about 200 feet from him, and running about 20 or 25 miles an hour. He saw the

first train when it stopped, and the other one hit it. This testimony was properly permitted to go to the jury for what it was worth. It was based upon what he saw and the estimated rate of its speed.

[6] The seventh assignment complains of the ruling of the court in refusing to allow the witness Lilley to testify in practical railroading in the operation of trains out of a given point in a fog, where he had the right to follow in five minutes and finds no flagman, no fusce, and no torpedo, whether or not in practical railroading that the failure to find those things conveyed any idea to this man, for the purpose of proving the absence of those things informed the rear engineer that the forward train had been gone more than five minutes. The rules were in evidence, and absence of these things would be apparent to any one, and it was a matter for the jury to pass upon. Such conditions or the absence of such things are matters for the jury. This assignment is overruled. For the same reason we overrule the eighth assignment of error.

[7] We overrule the ninth and tenth assignments of error. We find nothing stated or in the record showing that the verdict of the jury, in finding defendant guilty of negligence, was the result of passion, sympathy, or prejudice, and unjust in that the overwhelming weight and preponderance of the evidence showing that defendant was guilty of negligence, or that defendant was denied a fair and impartial trial, or that their answers to the special issues were the result of passion or prejudice or sympathy. The facts in this case clearly show negligence, causing the death of the conductor, and we cannot disturb the verdict. The jury found McLean guilty of negligence also.

[8] The eleventh assignment is a challenge in a general form, and in review again of the several rulings of the court already assigned and passed upon, more broadly expressed, comprehending an assault upon all the rulings of the court on the whole case. Similar objections have been already discussed. The evidence shows that the passenger train of the St. Louis, Brownsville & Mexico Railway Company, handled by the conductor, McLean, deceased, under the control of the Director General of Railroads, pulled out for Corpus Christi a few minutes late, ahead of a mixed train of the Texas-Mexican Railway operated by the same Director General of Railroads. The engineer of the train that Conductor McLean was on was William Meany. J. F. Rumsey was conductor of the Texas-Mexican mixed train, and J. J. Dowling the engineer thereof. McLean's train was switched onto the Texas-Mexican track at Robstown and pulled out ahead of the Texas-Mexican train for Corpus Christi. The engineer and conductor of the Texas-Mexican saw and knew when Mc-

Lean's train pulled out for the Texas-Mexican to follow; both trains destined for Corpus Christi. Under the rules governing the operation of the trains the Texas-Mexican Railway train was permitted to follow within five minutes after the first train left. The distance from Robstown to Corpus Christi was 15.9 miles. There were three stations between Robstown and Corpus Christi on this line, Violet, Land, and Clarkwood, the latter the nearer to Corpus Christi, all flag stations, and trains stopped only when flagged. The train of the St. Louis, Brownsville & Mexico train was scheduled to leave Robstown for Corpus Christi at 6:15 a. m., and time of arrival in Corpus Christi was 6:50. That morning there was a heavy fog, and it was difficult to distinguish objects unless right up to them. Meany did not compare watches with McLean at the time they pulled out for Corpus Christi, but it was 7:01. The running time to Corpus Christi was 35 minutes, and there was a heavy fog prevailing all the way. Just before the wreck he saw a person, one of the Sims boys living at Clarkwood, waving his hands wildly, and proceeded to stop the train as quickly as possible. When he applied the air he was approximately 70 or 80 feet west of the platform. The time was 7:19. The train was struck from behind. After that impact he stopped the engine, and he and his fireman got off to see the trouble. His train was badly broken up and telescoped by the impact from behind; Texas-Mexican engine buried in the Pullman sleeper, and other coaches telescoped; found McLean's body badly mangled and dead; the fog was so dense he could not see 50 feet ahead; had been running on the Texas-Mexican line five or six years, and was familiar with the track from Corpus Christi to Robstown. The effect of the fog was to make the track slippery and retard the view ahead, and the highest rate of speed under such circumstances would be 15 to 20 miles per hour. In the operation of trains over this track the trainmen on both trains were governed by the same standard rules in force on both roads under the same Director General. They were required to slow down in approaching crossings and stations to 12 miles an hour and to slow up on approaching switches between Robstown and Corpus Christi. The engineer and conductor determine the speed of trains while running. When flagged, the engineer is required to respond by two short blasts to let the flagger know he has observed it, and to likewise call the crew's attention to it, and he gave those signals at Clarkwood.

The written time table or card and the rules were all introduced in evidence. The standard rules require the conductor to protect the rear of his train at all times by the use of means furnished. If train stops, the conductor must see that a flagman goes back

proper distance to protect the rear of his train, or that a fusee be dropped. None was dropped at Clarkwood. While all this was required, the rule would not require an impossible thing. It was for the jury to say whether there was time to drop a fusee under the circumstances to give warning, or that failure at the time and under the circumstances, or at any time before that, in any way contributed to the injury, or that the failure to drop fusees from time to time, which, under the rules, was required of the forward train in dense fogs to do to warn the approaching train. Due regard to the safety of the passengers on his train required him to run as he did. They had no flagman on the train, and it is doubtful, if there had been one riding on the rear of the train, whether he would have had time to throw off a fusee after the passenger flagged at Clarkwood in time to stop the approaching train. In the absence of a flagman, that duty is performed by a rear brakeman, who has other duties that take him elsewhere in the train, and, if in the front coaches, he would not have had the time.

J. J. Dowling, the engineer of Texas-Mexican, testified he saw McLean's train leave for Corpus Christi, and, when he got clearance card from Conductor Rumsey at 7:05, pulled out for Corpus Christi. When he saw McLean's train at Clarkwood, he was 60 or 70 feet from it. Under the rules he was permitted to follow the train in five minutes. As he found no flagman to pick up or fusee at the East switch in Robstown, that had the effect to convey to him the information the train had gone. There was no speed limit on the train that he knew of, and there was no custom for engineers pulling trains to fall down on their schedules simply because there was a heavy fog. He saw the Pullman that morning, but did not know whether it had tail lights or not. After the wreck there was one tail light on the chair car and another in the ditch. Had there been a marker on the rear of train that morning, he could not have seen him in time to avoid the collision. He did not have time to jump from his train. If he had found any fusee on the track anywhere, he would have slowed down to ascertain the whereabouts of the advancing train. He was running at 28 or 30 miles an hour that morning. He did not hear Meany's whistle that morning, had never been able while riding in his car to hear another train whistle. He did not see Sims flag him; could not have seen him over 40 or 50 feet. The only limit on his train's speed that morning was 30 miles an hour, and when trains are late they pay no attention to schedule time.

Witness H. F. Sims, who lived at Clarkwood, flagged Conductor McLean's train to go to Corpus Christi. The engine was about 50 yards from him when it began to slow down. He saw Texas-Mexican train and endeavored to stop it; made the same motion while running down the track to stop the Texas-Mexican.

"Witness tried to flag the Texas-Mexican train. All this happened in a few seconds. The Texas-Mexican train had a headlight that morning, and witness could see the reflection of it so that he could tell it was a headlight 200 or 250 yards. * * * He heard both those trains whistle before they got to Clarkwood. They were down at the whistling board when they whistled. * * * It was a very foggy morning. Witness believed that he could have seen a man 50 or 60 yards in a fog. * * * When the Texas-Mexican train first came into the switch up there at Clarkwood, the engine slowed down some and was picking up again. There was somewhere between a second and a minute between the two trains. Witness did not know how far he ran down the track in the attempt to flag the Texas-Mexican train, but it was between 50 and 75 yards. He flagged with his hand. The whistle of the Texas-Mexican train for the station was what first attracted witness' attention to the fact that there was another train following the Brownsville train. The first thing he saw with reference to the Texas-Mexican train was the reflection from the headlight. He could not see it before it whistled because it was back of the station and the Brownsville train was in front of it. The Texas-Mexican train was about 200 yards from the Brownsville train when witness first saw. the reflection so that he could tell it was a train. He saw the bulk of the Brownsville train somewhere about 50 or 60 yards from him. He could see the reflection from the headlight between 200 and 250 yards. * * * The Brownsville engineer did see him and it looked reasonable that if one could see him, the other could see him. He didn't know whether the Brownsville engineer saw him but he was bound to have seen him before he got by witness or he never would have attempted to stop. Witness began flagging the Texas-Mexican train before he stopped and ran right alongside of the track. If one engineer could have seen him, the other could have seen him."

There is testimony from other witnesses, not train employees, as to the speed and the relative distances apart of the trains and the collision.

In one respect the testimony of the engineers as to speed in heavy fogs presents a marked contrast in respect to care in the operation of trains. We have the testimony of the engineer on Conductor McLean's train, in running his train through the heavy fog, that he had consideration for the life and safety of passengers committed to his care and ran at a rate of speed to protect them from possible danger, a speed of from 15 to 20 miles an hour, while the other's speed was at a rate of from 28 to 30 miles an hour, both trains under a common management with common rules to govern. The Texas-Mexican, if running at a speed of 30 miles an hour, was possibly running twice as fast as the passenger train. A careful reading of

all the testimony supports the finding of the jury in their several answers. It was not McLean's fault if no flagman was furnished, whose duty it was to take care of the rear of the train and give all necessary signals, but his negligence, if any, was in failing otherwise to follow the rules as to fusees. If the Texas-Mexican train had been running with respect to and mindful of the possible danger that a heavy fog would bring about there is no doubt but what he would have seen and have been stopped by the signals of the witness Sims, as McLean's train was, and there would perhaps have been no collision. The facts were all before the jury for their determination in respect to the negligence of any one or all.

The findings of the jury are in effect: (a) That the Director General of Railroads, through his servants and employees, was guilty of the acts of negligence in the operation of the trains as charged in plaintiff's fourth amended original petition; (b) that such negligence was the proximate cause of the collision which resulted in the death of W. F. McLean; (c) that W. F. McLean was guilty of negligence as charged in the answer of defendants; (d) that the negligence of W. F. McLean was not the proximate cause of the collision which resulted in his death; (e) that the negligence of McLean was not the sole cause of the collision which resulted in his death. These were correct issues, and we think the findings clear and comprehensive. The court submitted the case on the theory that the Director General was the master of all the servants on all the trains operated jointly on the same line of road under same arrangement made for that purpose by the Director General, and not upon separate lines of roads. We can see no error in that ruling or finding as we have shown herein.

[9] If appellants had desired a finding from the jury as to which set of trainmen caused the injury for any purpose for the better guidance of the Director General for the purpose of his accounts, the form of the issue should have been submitted, but the appellants merely contented themselves with objecting, without offering by special issues any assistance to enable the court to present other issues, if any others were necessary.

[10] We see no error in sustaining appellees' objection to permitting Mr. Lilley to give his opinion and to explain matters already in evidence as an expert in respect to testimony properly before the jury, whose duty it was to form their own opinion and judgment, and it would have added nothing more than his opinion to plain unambiguous matter. We have examined every bill of exception, all assignments of error, and propositions presented by the Director General in the name of each separate carrier assigned and urged. They present no substantial reversible error.

[11] McLean had been a railroad man and conductor of the road for many years and for the Brownsville road for 12 years, an experienced railroad man. At time of his death he was 40 years old, in good health, strong and robust. He was industrious, and worked regularly, earning between $200 and $250 each month; had been earning that nearly all the time since his marriage 3 years before his death. Hester McLean was his wife. Helen Josephine McLean was the only child of deceased by a former marriage, and was 12 years old when he was killed. He was keeping house, and when off duty spent his time around home with the family and caring for chickens, pigeons, other domestic affairs, and helping his wife around home in the care and education of her son by a former marriage. He provided well for his family and lived within his means. Family living expenses were between $150 and $175 per month, care and education of Helen costing between $40 and $50 per month, which necessarily would increase. Mrs. Hester McLean was 36 years old, and she and Helen were in good health.

W. F. McLean had a life expectancy of 28.18 years, Mrs. McLean of 31.07 years, and Helen Josephine McLean a life expectancy of 47.4 years. L. B. McLean, the father of deceased, was 71 years old, and his mother was 66 years old. Deceased contributed from $15 to $25 per month to their support. His father was not in good health, and his mother in poor health. Their life expectancies were 7.81 and 10.54 years, respectively. We cannot say under the facts in this case that the verdict was excessive or influenced improperly.

As already stated, the Texas-Mexican was following at a speed almost double that of the advanced train. They knew when the first train started. They followed on, this foggy morning, with rapid speed. The engineer of the following train already knew the train had only five minutes schedule time start ahead of his train, and, had there been a flagman putting out signs, dropping fusees, torpedoes, blowing whistles, and giving other signs that the train was ahead, would have given no more information than he had. If he had run slower, observed all the stopping places and not run so fast, and slowed down approaching Clarkwood, or seen the signal that Sims was giving, the collision would perhaps not have happened. The case was fairly submitted, and the jury found the Director General, as operating the two carrier trains under his own arrangement over the Texas-Mexican lines, to be the causal negligence of the Director General and any negligence of McLean was not the causal negligence that proximately caused his death. The testimony is clear and free from doubt and needs no explanation from expert witnesses.

The jury diminished the damages the sum

of $5,950, which was in proportion to the amount of the negligence found of said W. F. McLean, deceased.

We overrule all the assignments presented and urged in the name of the said two lines operated by the Director General, because we find no reversible error assigned.

The judgment of the trial court is affirmed.

### On Motion for Rehearing.

We are passing upon each motion for rehearing separately, the one of St. Louis, Brownsville & Mexico Railroad and the one for the Texas-Mexican Railway.

Counsel are mistaken in contending, in the motions for rehearing, that we did not pass on the separate assignments separately. We considered and passed upon all the assignments and propositions as contained in the separate brief of each party fully and completely. We did not see the necessity of writing two separate opinions to do so, when it could more easily be done in one opinion, as counsel seem to think we should have. We have again gone over, and very carefully considered again, the whole case, separate briefs, assignments, and the two motions for rehearing, and find nothing new that has not already been considered.

The two motions for rehearing are overruled.